CROWN TECHNOLOGY PARK v D&N BANK, FSB

Docket Nos. 207762, 213762. Submitted December 7, 1999, at Detroit. Decided September 15, 2000, at 9:05 A.M. Leave to appeal sought.

Crown Technology Park and Michael L. Stefani brought an action in the Oakland Circuit Court against D&N Bank, FSB, seeking damages on the basis of claims of promissory estoppel and negligence after having paid to the defendant under protest a prepayment penalty in order to discharge a loan that plaintiff Crown had secured from the defendant. The plaintiffs alleged that, although the promissory note included a provision that required the payment of a penalty if the note was repaid before its due date, a loan officer of the defendant had led plaintiff Stefani, who was the attorney for plaintiff Crown and was negotiating with the defendant concerning the discharge of the existing debt and the securing of a new note, to believe that the existing note could be retired without penalty. The plaintiffs further alleged that on the basis of the belief that the penalty provisions would not be enforced on the retirement of the existing note, plaintiff Crown had secured a new loan from another lender, had made improvements to the property that secured the discharged loan and secured the new loan, and had entered into a long-term lease of the property and that when the defendant had required the payment of the penalty to retire the note and mortgage that the defendant had held, the new lease became unprofitable. The defendant moved for summary disposition on the basis that plaintiffs' action was barred by the statute of frauds. The court, Edward Sosnick, J., denied the defendant's motion. A jury returned a verdict for the plaintiffs, and a judgment was entered on the jury's verdict. The court denied plaintiffs' motion for offer of judgment sanctions. The defendant appealed from the judgment, and plaintiff Crown appealed by leave granted the denial of its motion for sanctions. The appeals were consolidated.

The Court of Appeals *held*:

1. Subsection 2 of the statute of frauds, as amended by 1992 PA 245, MCL 566.132(2); MSA 26.922(2), provides that "an action shall not be brought against a financial institution to enforce" certain enumerated promises or commitments "unless the promise or commitment is in writing and signed with an authorized signature by

the financial institution." Among the promises and commitments enumerated in the statute are promises to modify the repayment or performance of a loan or to waive a provision of a loan.

2. The plaintiffs' assertion that subsection 2 of the statute of frauds does not bar the bringing of their action for promissory estoppel is without merit. The Legislature's reference in subsection 2 to "an action" evidences a clear intent that the statutory bar is unqualified and broad and that all actions involving one of the enumerated promises and commitments, including actions for promissory estoppel, fall within the scope of the statutory bar.

3. The fact that the Legislature did not retain the "legal or equitable actions" language of the model legislation on which subsection 2 is based does not evidence an intent by the Legislature that subsection 2 was not intended to bar equitable actions in light of the fact that the Legislature used the broadest possible language to describe the types of actions that were barred.

4. There is nothing in the language of subsection 2 to suggest that the Legislature, in enacting 1992 PA 245, intended to incorporate in that amendment of the statute of frauds the holding in *Lovely v Dierkes,* 132 Mich App 485 (1984), that the statute of frauds does not preclude the bringing of a common-law claim of promissory estoppel.

5. Because the plaintiffs' promissory estoppel claim sought to enforce the alleged oral promise made by an officer of the defendant, the claim was barred by the provisions of subsection 2 of the statute of frauds. Accordingly, the trial court erred in refusing to grant summary disposition for the defendant with respect to the promissory estoppel claim.

6. The plaintiffs' negligence claim, that the defendant's representative negligently induced the plaintiffs to believe that the prepayment penalty would be waived, is little more than a restatement of the promissory estoppel claim and, accordingly, is likewise barred by subsection 2 of the statute of frauds.

Reversed.

WHITBECK, P.J., concurring, wrote separately to state that the trial court also erred in refusing to grant summary disposition for the defendant with respect to the negligence claim on the basis that no duty of care existed.

FRAUDS, STATUTE OF — PROMISSORY ESTOPPEL — FINANCIAL INSTITUTIONS.

The provision in the statute of frauds barring an action brought against a financial institution to enforce certain enumerated promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized

signature by the financial institution bars all such actions, including the equitable action of promissory estoppel (MCL 566.132[2]; MSA 26.922[2]).

*Frank, Stefani & Haron* (by *Patrick C. Hall* and *Tamara E. Fraser*), for Crown Technology Park.

*Butzel Long* (by *Philip J. Kessler, Alan S. Levine* and *Susan K. Friedlaender*), for the defendant.

Before: WHITBECK, P.J., and TALBOT and ZAHRA, JJ.

ZAHRA, J. In Docket No. 207762 of this consolidated appeal, defendant D&N Bank, FSB, appeals as of right the trial court's judgment and order based on a jury verdict awarding plaintiff Crown Technology Park damages in the amount of $39,827.20, with interest, for its claims of promissory estoppel and negligence. In Docket No. 213762, Crown Technology appeals by delayed leave granted the trial court's order denying Crown Technology's motion for offer of judgment sanctions. We reverse. We conclude that the trial court erred in failing to grant D&N Bank's motion for summary disposition on Crown Technology's promissory estoppel and negligence claims.[1]

I. FACTS

D&N Bank is a Michigan corporation engaged in the banking business. Crown Technology is a Michigan partnership formed in 1985 to construct and own an office building (hereinafter the property) in Warren, Michigan. Michael Stefani is an attorney who represented Crown Technology since it was formed.

---

[1] Given our resolution of these summary disposition issues, we need not answer the other questions the parties raise in this appeal.

After constructing the property, Crown Technology leased it to Michigan Mutual Insurance Company (MMIC) as the single tenant under a ten-year lease.

In 1987, D&N Bank loaned $720,000 to Crown Technology to refinance the property. D&N Bank secured this loan with a mortgage on the property. The refinancing agreement required Crown Technology to make 119 monthly payments of $6,991.84 until March 19, 1997, at which time Crown Technology would have to pay all unpaid principal and all accrued interest. The parties executed a promissory note on March 20, 1987.[2] The promissory note included a prepayment penalty that is the basis for this lawsuit. That penalty clause states in pertinent part:

> The indebtedness evidenced by this note may not be prepaid, in full or in part, prior to March 1, 1997. In the event of acceleration of payment prior to such time, for any reason whatsoever, Maker [Crown Technology] shall pay the holder hereof, in addition to the principal balance, accrued interest, penalties and any other amounts due hereunder, additional interest equal to the interest which would have accrued to such date.

In December 1991, a commercial loan officer at D&N Bank became aware that MMIC had vacated the property. D&N Bank officers were concerned that Crown Technology would not be able to make its payments on the loan even though MMIC was still paying rent on the property. D&N Bank officers wanted a tenant to occupy the property.

---

[2] Some time after the loan was executed, D&N Bank sold ninety percent of the loan to an insurance company. However, D&N Bank continued to service the loan.

Over the next several years, D&N Bank regularly inquired of Crown Technology's counsel whether Crown Technology was taking steps to find a new occupant. Counsel for Crown Technology interpreted some of these inquiries as indicating that D&N Bank was open to the possibility of "restructuring" or refinancing the loan. At least twice in 1993, D&N Bank loan officers reviewed the risk evaluation of the loan. The loan continued to be rated as a moderate risk. However, internal documents from D&N Bank indicate that the loan was closely monitored.

On April 26, 1994, Stefani met with Jamie Muter, a commercial loan officer for D&N Bank, to discuss the loan and the potential for a new tenant, GE Capital Leasing. Stefani sent Muter a letter to confirm the nature of their discussions. The letter noted that Crown Technology was considering leasing the property to GE Leasing under a ten-year lease, which would require Crown Technology "to build a 3,000 square foot addition to the building, to acquire an adjoining 2.6 acres and to construct an automobile storage area on that acreage. . . ." Stefani stated that Crown Technology was "quite anxious to sign a lease with GE, but [was] reluctant to do so until [Crown Technology] know[s] what the financing would cost."

Some time later, Stefani informed Muter that Crown Technology was interested in obtaining a new loan of $1.4 million with a ten-year fixed interest rate. Muter informed Stefani that D&N Bank was willing to loan Crown Technology money at approximately nine percent interest, which included "any points or fees." However, D&N Bank would agree to a fixed rate only for the first five years of the loan. Following this conversation, Stefani asked Muter if there was "any way"

D&N Bank could extend a ten-year fixed interest rate to Crown Technology so that it could meet GE Leasing's demands. Stefani told Muter that Crown Technology was negotiating with other lenders who had agreed to extend a ten-year fixed rate and asked Muter whether "there was going to be any problem with [Crown Technology] paying off this loan early" in the event Crown Technology sought refinancing elsewhere. Stefani testified that Muter replied:

"[']I checked and there's no prepayment penalty[,'] or . . . words to that effect. He definitely [led] me to believe that he had checked—he didn't say who he checked with or what he checked—but he said . . . [']I've already checked and there will be no problem with you paying off the loan or there will be no prepayment penalty.[']"

Although Stefani was "generally aware" that the promissory note provided a prepayment penalty, he did not believe D&N Bank would enforce it. Stefani did, however, admit that he was experienced in commercial real estate transactions and did not claim that the terms of the loan itself were confusing to him.

Stefani contacted Muter shortly thereafter to determine whether Muter had given Crown Technology D&N Bank's last, best offer. Muter reportedly told Stefani that D&N Bank would not go beyond its original loan offer. Stefani replied that Crown Technology would repay the original loan sometime in late summer or early September, when GE Leasing moved into the property. In a D&N Bank interoffice memorandum, Muter detailed D&N Bank's rejection of Stefani's loan request and stated that refinancing through another lender would occur. Muter completed another risk classification memo in June 1994, in which he

stated that D&N Bank "expect[ed] the loan to be paid in full within the next few months."

On June 28, 1994, Crown Technology and GE Leasing signed a lease. In September of 1994, Stefani contacted Muter and requested an early payoff by September 15. A D&N Bank employee informed Muter that the loan was closed to prepayment until maturity, and Muter relayed this information to Stefani. Stefani was displeased and claimed that Muter never informed him that D&N Bank was unwilling to waive the prepayment restriction and penalties. Stefani relied on his past experience to conclude that banks routinely waived prepayment penalties. Stefani testified that he "assumed that they were so worried about this building being vacant that they were going to waive the prepayment in order to solve their problem." Stefani contacted D&N Bank's president and told him that Crown Technology had been assured in May 1994 that prepaying the loan would not be a problem and that "[Crown Technology] went ahead and did all these things in reliance on that[, like] the construction of the building, the purchase of the land and signing the lease."

On September 27, 1994, Muter sent a letter to Stefani stating that D&N Bank had further reviewed Crown Technology's request for payoff and that "[i]t is not our intention to prohibit prepayment on the loan, but only to be compensated for the loss of income upon reinvestment." Muter did not reveal the amount that defendant intended to charge as a prepayment penalty, but wrote, "If you are still interested in paying the loan in full, prior to its maturity, please contact our office so our requirements may be discussed." According to Stefani, because of the steps

Crown Technology had already taken to obtain GE Leasing as a tenant, he concluded that Crown Technology had no choice in the matter and that early payoff and paying the penalty were necessary. Stefani said that if he had known that D&N Bank was going to enforce the prepayment penalty he would have renegotiated the lease with GE Leasing to account for that penalty by raising rent, eliminating some of the improvements, or Crown Technology would not have entered into the lease at all. Stefani believed that his only other realistic options, given the tight profit margin on the lease with GE Leasing, would have been to take the refinanced loan only for the five-year fixed term D&N Bank offered or to pursue discussions with another potential tenant who expressed interest in a shorter lease. On December 21, 1994, some three months after Crown Technology requested a payoff letter from D&N Bank, D&N Bank informed Crown Technology that the prepayment penalty was $66,378.67, which Crown Technology eventually paid under protest once the new loan was closed.

Frank Donnelly, the Senior Vice President of D&N Bank's Commercial Lending Division, later explained D&N Bank's view on the prepayment issue, differentiating between the terms "closed to prepayment" and "prepayment penalty" as they appeared in the promissory note. He stated that if a loan agreement provided that the loan was closed to prepayment, D&N Bank would not accept prepayment at all. On the other hand, if a loan agreement provided for a prepayment penalty, then D&N Bank would allow prepayment if the borrower paid a penalty.

In Crown Technology's case, Donnelly said, the promissory note was closed to prepayment and D&N

Bank's loan committee, and the insurance company that had purchased ninety percent of the loan, had to authorize any change to this term. This authorization had to be rendered in writing. D&N Bank did not authorize Muter to alter the terms of Crown Technology's loan agreement because D&N Bank did not ordinarily waive prepayment penalties, even if D&N Bank refinanced a loan. Although Donnelly concluded that D&N Bank had not taken any of the steps necessary to waive the prepayment penalty, he acknowledged that Muter should have communicated to Stefani any "significant costs" relative to the payoff of the loan.

## II. LEGAL ANALYSIS

D&N Bank argues that the trial court erred in refusing to summarily dispose of Crown Technology's promissory estoppel and negligence claims pursuant to MCR 2.116(C)(8) and MCR 2.116(C)(10).[3] We review a trial court's decision on a motion for summary disposition de novo. *Spiek v Dep't of Transportation,* 456 Mich 331, 337; 572 NW2d 201 (1998). This issue also involves a basic question of statutory interpretation, which, as a question of law, this Court also reviews de novo. *Cipri v Bellingham Frozen Foods, Inc,* 235 Mich App 1, 8; 596 NW2d 620 (1999).

A motion for summary disposition under MCR 2.116(C)(8) tests whether the pleadings of a claim or

---

[3] D&N Bank also argues that the trial court erred in failing to grant a directed verdict or its motion for judgment notwithstanding the verdict (JNOV). Given that there is no genuine and material difference between the evidence argued in the motion for summary disposition pursuant to MCR 2.116(C)(10) and the evidence presented at trial, there is no different standard of review regarding the summary disposition motion, the motion for a directed verdict, and the JNOV motion.

defense are legally sufficient. *Simko v Blake*, 448 Mich 648, 654; 532 NW2d 842 (1995). We must accept all well-pleaded factual allegations as true and determine whether such facts constitute a legal claim or defense. *Smith v Stolberg*, 231 Mich App 256, 258; 586 NW2d 103 (1998). A motion under MCR 2.116(C)(10) tests whether there is factual support for a claim. *Spiek*, *supra*. This Court must look at all the evidence in the light most favorable to the nonmoving party, who must be given the benefit of every reasonable doubt. *Atlas Valley Golf & Country Club, Inc v Goodrich*, 227 Mich App 14, 25; 575 NW2d 56 (1997). If there exists no factual dispute, the court should grant summary disposition. See *Aetna Casualty & Surety Co v Ralph Wilson Plastics Co*, 202 Mich App 540, 548; 509 NW2d 520 (1993). The dispute must be genuine and material. *Id.* Thus, the nonmoving party must present more than mere allegations in order to demonstrate that summary disposition ought not be granted. MCR 2.116(G)(4); *Etter v Michigan Bell Telephone Co*, 179 Mich App 551, 555; 446 NW2d 500 (1989).

## A. THE PROMISSORY ESTOPPEL CLAIM

D&N Bank argues that the trial court erred in finding that the statute of frauds, MCL 566.132; MSA 26.922, did not bar Crown Technology's promissory estoppel claim. The parties to this action did not enter into a written agreement to modify the prepayment clause. Therefore, D&N Bank contends, Crown Technology cannot prevail on any claim that D&N Bank orally waived the prepayment penalty for the loan.

The statute of frauds, MCL 566.132; MSA 26.922, requires certain types of agreements to be in writing before they can be enforced. This Court has, on at least one occasion, held that "where it would be inequitable to apply the statute of frauds," the common-law claim of promissory estoppel can bar application of the statute of frauds. *Lovely v Dierkes*, 132 Mich App 485, 489; 347 NW2d 752 (1984).[4] In order to invoke promissory estoppel, the party relying on it must demonstrate that (1) there was a promise, (2) the promisor reasonably should have expected the promise to cause the promisee to act in a definite and substantial manner, (3) the promisee did in fact rely on the promise by acting in accordance with its

---

[4] We question the viability of *Lovely, supra.* Promissory estoppel is a judicially created doctrine that was developed as an equitable remedy applicable in common-law contract actions. Unlike a traditional common-law contract claim or defense, the statute of frauds is legislatively mandated. The Michigan Legislature has determined that, for those contracts specifically identified in the statute of frauds, it is important to provide certainty and to avoid controversy over the terms of alleged contracts. Thus, such contracts must be reduced to writing. As noted by Judge PETERSON in his dissenting opinion in *Lovely, supra* at 493, "[w]e start any discussion of the statute of frauds with the posit that its application may result in substantial injustice. Real and honest contracts will not be enforced because of the statute of frauds; honest [people] will lose the benefits of their bargains because they neglected to reduce them to writing." Given this premise, the role of the judiciary is to apply the statute of frauds as written, without second-guessing the wisdom of the Legislature. In *Lovely*, this Court, by finding that a claim of promissory estoppel can preclude the application of the statute of frauds, essentially found that judicial policy balancing can override the policy choices of the Legislature. Such a conclusion is contrary to well-founded principles of statutory construction and is inconsistent with traditional notions of the separation of powers between the judicial and legislative branches of government. See Scalia, A Matter of Interpretation: Federal Courts and the Law (New Jersey: Princeton University Press, 1997), pp 14-29. Notwithstanding our serious concerns, we need not determine whether *Lovely* was wrongly decided, because legislative amendments of the statute of frauds enacted in 1992 clearly provide that a viable claim of promissory estoppel cannot be asserted in the present case.

terms, and (4) and the promise must be enforced to avoid injustice. *Id.*

In 1992, the Legislature responded to an apparent problem in the banking industry by amending the statute of frauds, MCL 566.132;   MSA 26.922, with 1992 PA 245, effective January 1993. Specifically, 1992 PA 245 added:

> (2) An action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is *in writing and signed with an authorized signature* by the financial institution:
>
> (a) A promise or commitment to lend money, grant or extend credit, or make any other financial accommodation.
>
> (b) A promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation.
>
> (c) A promise or commitment to waive a provision of a loan, extension of credit, or other financial accommodation. [Emphasis supplied.]

The plain language in this amendment of the statute of frauds addresses the area of conduct promissory estoppel ordinarily governs—oral promises.

We must determine and give effect to the Legislature's intent when answering the essential question presented here—whether MCL 566.132(2);   MSA 26.922(2) bars enforcement of the oral promise or commitment at issue in this case. To do so, we first review the language of the statute itself. *Kiesel Intercounty Drain Drainage Dist v Dep't of Natural Resources*, 227 Mich App 327, 334; 575 NW2d 791 (1998). If the statute is unambiguous on its face, we simply enforce the statute as written. *Id.*

MCL 566.132(2); MSA 26.922(2) expressly states that "[a]n action *shall not be brought against a financial institution* to enforce [a promise or commitment to waive a provision of a loan] unless the promise or commitment is in writing and signed with an authorized signature by the financial institution" (emphasis supplied). This language is unambiguous. It plainly states that a party is precluded from bringing a claim—no matter its label—against a financial institution to enforce the terms of an oral promise to waive a loan provision.

Crown Technology's argument that MCL 566.132(2); MSA 26.922(2) does not eliminate promissory estoppel as a cause of action for an unfulfilled oral promise to waive a loan term is unpersuasive. The statute of frauds specifically bars "an action." By not specifying what sort of "action" MCL 566.132(2); MSA 26.922(2) prohibits, we read this as an unqualified and broad ban. We also note that the subsections of MCL 566.132(2); MSA 26.922(2) use generic and encompassing terms to describe the types of promises or commitments that the statute of frauds now protects absolutely. This is consistent with interpreting MCL 566.132(2); MSA 26.922(2) to preclude *all* actions for the enumerated promises and commitments, including actions for promissory estoppel. Further, it would make absolutely no sense to conclude that the Legislature enacted a new section of the statute of frauds specifically addressing oral agreements by financial institutions but, nevertheless, the Legislature still intended to allow promissory estoppel to exist as a cause of action for those same oral agreements.

The plain language of the statute of frauds is also inconsistent with Crown Technology's argument that

the Legislature intended to permit promissory estoppel actions because MCL 566.132(2); MSA 26.922(2) differs from model legislation the American Bar Association drafted in response to the dramatic increase of "lender liability" in the 1980s. See Culhane & Gramlich, *Lender liability limitation amendments to state statutes of frauds*, 45 Bus Law 1779, 1779-1781 (1990). The model legislation refers to barring "legal or equitable" actions absent a written commitment or agreement. *Id.* at 1792. The model legislation would, therefore, plainly bar an equitable action like promissory estoppel. The Legislature's decision to deviate from the model act when adopting MCL 566.132(2); MSA 26.922(2) does suggest that it rejected the differing language in the model act. See *Husted v Auto-Owners Ins Co*, 459 Mich 500, 509-510; 591 NW2d 642 (1999). However, as we noted above, the Legislature used the broadest possible language in MCL 566.132(2); MSA 26.922(2) to protect financial institutions by not specifying the types of "actions" it prohibits, eliminating the possibility of creative pleading to avoid the ban. Thus, the difference in the language between the model act and the statute does not persuade us that MCL 566.132(2); MSA 26.922(2) permits actions for promissory estoppel.

Nor do we agree that "legislative acquiescence" preserved promissory estoppel as a permissible form of action to enforce an unwritten promise or commitment by a financial institution enumerated in MCL 566.132(2)(a) to (c); MSA 26.922(2)(a) to (c). Legislative acquiescence presumes that the Legislature acted with knowledge of appellate court interpretations of statutes. See *Gordon Sel-Way, Inc v Spence Bros, Inc*, 438 Mich 488, 505-506; 475 NW2d 704 (1991). Crown

Technology contends that the Legislature was silent concerning promissory estoppel in MCL 566.132(2); MSA 26.922(2) and, therefore, intended to keep the preexisting case law permitting this cause of action in full effect. We disagree with this premise for two reasons. First, the Legislature was not silent concerning promissory estoppel in MCL 566.132(2); MSA 26.922(2). It banned "an action," meaning *any* action. To overstate the obvious, "an action" for promissory estoppel clearly is "an action" within the meaning of the identical language of the statute of frauds.

Second, even if we were to conclude that the Legislature was silent on this issue, we would hesitate to rely on legislative acquiescence to maintain this cause of action because legislative acquiescence is disfavored as an "exceedingly poor indicator of legislative intent." *Donajkowski v Alpena Power Co*, 460 Mich 243, 258-260; 596 NW2d 574 (1999).

Finally, we reject Crown Technology's argument that, by failing to enact separate lender liability legislation, the Legislature intended to preserve promissory estoppel as a viable form of action against financial institutions to enforce oral loan modifications. There is no evidence whatsoever that, by codifying this prohibition against suits to enforce a financial institution's unwritten promise or commitment, the Legislature intended for the other provisions in the statute of frauds to override the plain language used in the section we address here. Moreover, it was quite reasonable for the Legislature to codify MCL 566.132(2); MSA 26.922(2) with the other provisions of the statute of frauds because their subject matter is similar. Like the larger statute of frauds, the financial institutions provision deals with the enforceabil-

ity of an unwritten agreement. That it applies to a select group of potential promisors is no surprise. The statute of frauds has a number of provisions that apply exclusively to certain industries or circumstances where oral promises are common. See, e.g., MCL 566.134; MSA 26.923 (addressing how writings related to an auction become the memorandum necessary under MCL 566.132[1]; MSA 26.922[1] to enforce the oral buy-sell agreement established through bidding). The Legislature's decision to bring the laws governing dissimilar oral agreements together in one section of the code does not compel a particular result in this case, much less one favoring Crown Technology.

By bringing its promissory estoppel claim, Crown Technology asked the trial court to enforce D&N Bank's alleged oral promise to waive the prepayment term in the promissory note. In clear and unambiguous language, MCL 566.132(2); MSA 26.922(2) specifically bars this type of action. The trial court should have summarily disposed of this claim because there was no relief available. MCR 2.116(C)(8) and (C)(10).

### B. THE NEGLIGENCE CLAIM

The parties also dispute whether MCL 566.132(2); MSA 26.922(2) bars Crown Technology's negligence claim against D&N Bank. MCL 566.132(2); MSA 26.922(2) does not automatically bar a negligence claim because it only addresses enforcing certain types of unwritten promises. If a borrower has a separate claim for negligence that does not rely on enforcing the terms of an alleged oral promise, then MCL 566.132(2); MSA 26.922(2) is not a bar to adjudicating the claim on its merits.

In this case, however, Crown Technology's negligence claim is intimately related to its promissory estoppel argument concerning D&N Bank's representations about the prepayment penalty. Crown Technology alleged that D&N Bank negligently induced it to believe that it would waive the prepayment penalty. This argument is little more than another way to express the second element of promissory estoppel. Stated differently, plaintiff's "negligence claim" is, at its core, an action to enforce an oral promise and, accordingly, is barred by MCL 566.132(2); MSA 26.922(2). Crown Technology merely reiterates its belief that D&N Bank, through its employees, knew that its oral representations would induce it to enter into the lease agreement with GE Leasing, forcing it to find other financing and incur the prepayment penalty. Because we may draw reasonable inferences from the facts pleaded in the complaint, *Smith, supra* at 258, we will not defeat MCL 566.132(2); MSA 26.922(2) by relying on the superficial language of the complaint while ignoring its substance.[5] Given the foregoing analysis of the promissory estoppel issue, no relief is available for this sort of claim and the trial court erred in denying summary disposition. MCR 2.116(C)(8) and (C)(10).

Reversed.

TALBOT, J., concurred.

---

[5] In *Local 1064, RWDSU AFL-CIO v Ernst & Young*, 449 Mich 322, 327, n 10; 535 NW2d 187 (1995), the Supreme Court noted that "[i]t is well accepted that in ruling on a statute of limitations defense the court may look behind the technical label that plaintiff attaches to a cause of action to the substance of the claim asserted." We conclude that this rationale applies equally to matters involving the statute of frauds.

WHITBECK, P.J. (*concurring*). I concur in the lead opinion's reasoning and result. I write separately because the relationship between promissory estoppel and Crown Technology's negligence claim is not easy to understand and should be addressed fully.

Negligence and promissory estoppel are ordinarily distinct causes of action. The record in this case leaves no doubt that Crown Technology pleaded a prima facie case of negligence by alleging duty, breach, causation, and damages. *Schultz v Consumers Power Co*, 443 Mich 445, 449; 506 NW2d 175 (1993). I note, in particular, that the damages Crown Technology alleged in the complaint went beyond the prepayment penalty. There is, therefore, a chance that the negligence claim in this case was not merely an attempt to restate the losing promissory estoppel argument. Accordingly, I address D&N Bank's argument that summary disposition was appropriate for the negligence claim because it did not have a duty to avoid making the oral statements Crown Technology alleged as the basis of its negligence claim.

Crown Technology claims that D&N Bank had a duty to

> be aware of the loan terms, including the prepayment restrictions, and to apprise Crown Tech when asked that it intended to enforce those restrictions if it really intended to. This duty also required D&N [Bank], when made aware through internal memoranda that Crown Tech intended to repay the loan early, to contact Crown Tech and inform it that D&N [Bank] intended to enforce the restriction prior to Crown Tech irrevocably committing itself to prepaying the loan.

Because Crown Technology has not pointed to any authority establishing these specific duties of care, I

employ the traditional analysis to determine if D&N Bank was under these duties when dealing with Crown Technology.

In *Terry v Detroit*, 226 Mich App 418, 424; 573 NW2d 348 (1997), this Court outlined the role duty plays in a negligence claim and how to determine when a duty exists:

> In order to establish a prima facie case of negligence, the plaintiff must prove: "(1) that the defendant owed a duty to the plaintiff; (2) that the defendant breached that duty; (3) that the defendant's breach of duty was a proximate cause of the plaintiff's damages; and (4) that the plaintiff suffered damages." *Baker v Arbor Drugs, Inc*, 215 Mich App 198, 203; 544 NW2d 727 (1996). Duty is an obligation that the defendant has to the plaintiff to avoid negligent conduct. *Id*. Whether a duty exists is a question of law for the court. *Simko v Blake*, 448 Mich 648, 655; 532 NW2d 842 (1995). If a court determines as a matter of law that a defendant owed no duty to a plaintiff, summary disposition is appropriate under MCR 2.116(C)(8). *Dykema v Gus Macker Enterprises, Inc*, 196 Mich App 6, 9; 492 NW2d 472 (1992).
>
> In determining whether a duty exists, courts look to different variables, including the (1) foreseeability of the harm, (2) degree of certainty of injury, (3) existence of a relationship between the parties involved, (4) closeness of connection between the conduct and injury, (5) moral blame attached to the conduct, (6) policy of preventing future harm, and (7) the burdens and consequences of imposing a duty and the resulting liability for breach. *Buczkowski* [*v McKay*, 441 Mich 96, 101; 490 NW2d 330 (1992)] citing Prosser & Keeton, Torts (5th ed), § 53, p 359, n 24; *Baker, supra*. The mere fact that an event may be foreseeable is insufficient to impose a duty upon the defendant. *Buczkowski, supra* at 101.

Under *Terry*, D&N Bank did not owe the duties Crown Technology enumerated. The harm alleged in the complaint, including the expenses Crown Tech-

nology incurred while seeking out a mortgage broker and fulfilling its obligations under the lease with its new tenant, have very little connection to the ability of D&N Bank's staff to recall and restate the terms of the written loan agreement at any time. The written loan agreement itself is the best evidence of the parties' legal obligations. Thus, a certain and foreseeable injury would not clearly result from D&N Bank's representations following binding execution of the loan agreement.

While D&N Bank's alleged misrepresentation might have a close connection with some of the injuries Crown Technology said it sustained, that is not necessarily so. For instance, Crown Technology's decision to go to a mortgage broker was likely a function of D&N Bank's refusal to offer refinancing terms that Crown Technology desired and not a product of the statements concerning the prepayment penalty. Similarly, Crown Technology chose to discharge Michigan Mutual Insurance Company from its remaining lease obligations and to carry out the terms of its agreement with GE Leasing because of business dealings it commenced *before* approaching D&N Bank about the prepayment penalty. Consequently, even if certain and foreseeable injuries could flow from the misstatements, they were not intimately connected to the injuries alleged in this case.

Although I emphasize that courts do not, and should not, condone purposefully misleading statements, the duty Crown Technology asks this Court to recognize would set a dangerous precedent. Taken at its extreme, Crown Technology's proposed duty of care would require a financial institution to waive its unequivocal legal rights because of an inadvertent

statement contrary to a loan's written terms. It simply is unnecessary to require a bank to make every employee affirm, in every conversation, that it intends to enforce the plain language of its lending contract with a borrower to protect against unfair, improper, or injurious conduct. A reasonable person would simply assume that the written contract would be enforced by its plain terms even while negotiations continue. Thus, I see no negligence in a bank's failure to carry out the duty Crown Technology identifies, namely, constant reaffirmation of the bank's previously stated intent to hold a borrower to a written prepayment penalty.

*Terry's* last two factors examine the consequences of imposing or withholding the duties Crown Technology asks this Court to recognize. In this regard, I go back to 1992 PA 245, which embodies a policy favoring definiteness and security in loan transactions. MCL 566.132(2); MSA 26.922(2) now requires borrowers to protect their own interests by obtaining written, signed agreements to modify original loan agreements. Consequently, with this statute of frauds in force, oral representations become of only minor importance, if at all important, and there is no need to recognize a duty of care concerning oral representations in this context.

Even if there may be cases in which a duty should arise concerning oral representations, this is not such a case. Stefani, an attorney and sophisticated businessman, knew the terms of the written loan agreement and, nevertheless, persisted in his attempts to persuade D&N Bank to waive the prepayment penalty and offer refinancing. The parties were certainly free to negotiate concerning these matters. However, I

would have to ignore firm principles of contract law to conclude that after the parties fail to agree, one party is free to seek recovery in tort for the expenses it sustained because an agreement did not result from the negotiations. See generally *Kamalnath v Mercy Memorial Hosp Corp*, 194 Mich App 543, 548; 487 NW2d 499 (1992), quoting *Stanton v Dachille*, 186 Mich App 247, 256; 463 NW2d 479 (1990) (" 'In order to form a valid contract, there must be a meeting of the minds on all the material facts.' "). Read carefully, none of the damages Crown Technology alleged in its complaint under the negligence count would have existed had D&N Bank canceled the prepayment penalty and refinanced the original loan in accordance with Crown Technology's terms.[1] However, with a presumably[2] valid and enforceable loan agreement in place, D&N Bank was under no obligation to accede to these terms.

In sum, I see no reason in the context of this case to impose a duty of care on D&N Bank in answering Stefani's inquiries on behalf of Crown Technology or participating in the negotiations he instigated when he was fully aware of the terms of the preexisting written loan agreement. I conclude that the trial court erred in denying summary disposition under MCR 2.116(C)(8) for the negligence claim because no duty of care existed. Therefore, in addition to the reasons articulated in the lead opinion, I would also reverse the judgment of the trial court on this ground.

---

[1] This is why our initial impression of this claim is that it was merely a promissory estoppel claim masquerading as negligence.

[2] The parties do not ask this Court to determine whether the original loan agreement was valid and enforceable.