**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a1008n.06

**No. 11-3938**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
**Sep 12, 2012**
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| FIRST FEDERAL BANK OF THE MIDWEST, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | On Appeal from the United States |
| v. | ) | District Court for the Northern |
| | ) | District of Ohio |
| BRION R. BAITH; LISA L. BAITH; | ) | |
| KAREN L. BAITH, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

Before: BOGGS and MCKEAGUE, Circuit Judges; and WATSON, District Judge.[*]

BOGGS, Circuit Judge. Brion, Lisa, Karen, and Robert Baith executed a promissory note

for $748,000 with First Federal Bank of the Midwest ("First Federal") in 2005.[1] The Baiths

purchased an apartment building, The Arlington, with the money. In 2007, Karen and Robert Baith

transferred their interest in the property to Brion and Lisa. In 2010, Brion and Lisa stopped paying

the installments owed on the promissory note (the "Arlington loan"). At that time, per the terms of

the note, the entire remaining amount became due. First Federal sold The Arlington to satisfy the

debt, but the sale left a remaining debt of $408,182. First Federal sought to recover this amount from

---

[*]The Honorable Michael H. Watson, United States District Judge for the Southern District of Ohio, sitting by designation.

[1]Karen and Robert Baith were married. Brion and Lisa Baith are Karen's son and daughter-in-law.

the Baiths personally. After removal by defendants, the district court granted summary judgment in First Federal's favor. Only Karen Baith appeals, arguing that First Federal released her from her obligation on the Arlington Loan, and the district court erred when it judged her to still be liable. The district court's decision is affirmed.

I

On June 30, 2005, Karen Baith, along with her husband, Robert, and Brion and Lisa Baith, took out a loan of $748,000 with First Federal in order to purchase an apartment building, The Arlington. The Baiths executed a promissory note for the loan. The note named all four Baiths as "jointly and severally promis[ing]" to repay the loan, with interest, beginning June 30, 2005. The note also contained the following provision:

> Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.

In October 2007, Robert and Karen Baith sold their ownership interest in the apartment to Brion and Lisa. A few months after this transaction, Robert Baith passed away. In April 2008, First Federal gave Brion and Lisa Baith two additional loans—one for $110,000 and one for about $350,000.

On November 23, 2009, First Federal and the remaining Baiths—Karen, Brion, and Lisa—executed a "Change in Terms Agreement" on the Arlington loan. The impetus for the change in terms was twofold—Robert Baith's death and Brion and Lisa's difficulty keeping up with the payments on the loan. The Change in Terms Agreement "modif[ied] the payment schedule, add[ed]

collateral and remove[d] Robert J. Baith as a borrower." The Agreement allowed Brion and Lisa Baith, who were having trouble making their payments, to make interest-only payments for six months. The Agreement also added two additional properties, owned by Brion and Lisa, as collateral for the loan. Finally, the Agreement stated that, "[T]his Note will no longer include Robert J. Baith as a borrower due to his death." The Agreement contained the following provision:

> Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect. . . . It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligation(s) . . . unless a party is expressly released by Lender in writing.

The Agreement bears the signatures of Brion, Lisa, and Karen Baith, on lines designated "Borrower."

Craig Curtis, First Federal's Vice President of Commercial Lending, provided as attachments to his affidavit below several letters he sent to the Baiths between November 13, 2009 and July 2, 2010, regarding the financial health of The Arlington and the Baiths' loans. In none of these letters is it stated that Karen Baith is merely a guarantor. In a letter dated November 13, 2009, First Federal discussed the Baiths' loans, designating the "A" loan, the "B" loan, and the "C" loan. Apparently, the "B" loan was for the Arlington apartment, since it had a balance of $666,610. The "A" and "C" loans, which had balances of $331,145 and $105,819, respectively, were apparently the smaller loans Brion and Lisa took out after they took out the Arlington loan. In the letter, Karen is referred to as a "Borrower," along with Brion and Lisa, on the "B" loan. Only Brion and Karen are listed as the "Borrower" on the "A" loan and the "C" loan.

On December 5, 2009, Craig Curtis sent a memorandum to Karen Baith. First Federal had asked Karen to allow her interest in the Arlington apartment building to be additional collateral for

the two smaller loans that Brion and Lisa Baith had taken out after the Baiths took out the Arlington loan. Curtis's memorandum was in regard to this cross-collateralization agreement. The memo stated the following:

> Karen:
>
> Per our previous conversations regarding the cross-collateralization of all three loans, First Federal presently has three (3) loans Lisa and Brion [sic] including the one on which *you are a guarantor.* They are:

| Loan | Balance | Collateral |
|------|---------|-----------|
| #661289826 | $105,592.62 | "Reed Street" |
| #661226737 | $330,088.82 | "Glen Ridge" |
| #661236348 | $664,747.11 | "Arlington" |

> The purpose of this cross-collateralization is to provide additional security to First Federal Bank on the two smaller loans—Reed Street and Glen Ridge. In other words, if either of these properties are [sic] sold, and the balance of the loan is higher than the agreed upon sale price, we would look to the Arlington loan to provide additional support based upon its (presumed) equity. . . .
>
> At no time are you a guarantor on these two smaller loans. You are only agreeing to allow First Federal Bank to take some of YOUR investment holdings (i.e., strictly Arlington), as additional security for the two smaller loans. In doing this, it does not affect in ANY way, any of your additional assets.
>
> We can discuss this further at any time.
>
> Craig Curtis

(emphasis added).

On September 15, 2010, First Federal commenced foreclosure proceedings against the Baiths in the Court of Common Pleas in Lucas County, Ohio. First Federal's complaint alleged ten claims.

This appeal only deals with one: First Federal's breach of contract claim regarding the Arlington loan.

On October 15, 2010, the Baiths removed the case to the United States District Court for the Northern District of Ohio.

On December 8, 2010, the Baiths filed their answer to First Federal's complaint in the district court. Brion and Lisa Baith did not participate in the answer.[2] Karen Baith asserted eight affirmative defenses and a counterclaim against First Federal.

Because there is dispute among the parties as to the content of Baith's affirmative defenses, they are detailed here. The affirmative defenses Karen Baith raised were: (1) "Release and Satisfaction," arguing that First Federal's consent to Karen transferring her interest in the Arlington property to Brion and Lisa meant that the bank "implicitly acknowledged" that Karen was no longer responsible or liable on the Arlington loan; (2) "No Consideration," arguing that Karen received no consideration for executing any documents for First Federal; (3) "No Detrimental Reliance," arguing that First Federal did not rely on any of Karen's assets in making a loan to Brion and Lisa, (4) "Appraisal Statutes/Standards," arguing that the properties Brion and Lisa purchased "met all appraisal standards and requirements of the Fed," and that there was, therefore, no need for Karen to provide First Federal with her guaranty; (5) "Lack of Cooperation/Breach of Contract/Duty," arguing that First Federal increased Karen's liability and exposure by refusing to allow a payoff of

---

[2]In order to meet their financial obligations, Brion and Lisa have sold all of their properties, including The Arlington. However, there is still a shortfall of $409,182.58, which First Federal seeks to recover from Brion, Lisa, and Karen, under the terms of the Arlington loan.

the Arlington loan; (6) "Failure of Notification," arguing that First Federal increased Karen's exposure because it "did not keep her apprised" of her responsibility, and "did not properly supervise the loan" because it did not appoint a receiver; (7) "Failure to Execute Against Guarantor," arguing that by releasing Robert Baith from liability after his death, First Federal "impliedly released Karen Baith from the same obligation and/or increased her risk"; and (8) "Confession of Judgment," arguing that the "confession of judgment" executed by Karen was invalid as being against public policy.

Karen Baith's counterclaim, also asserted in her answer, stated that First Federal told her, when she and Robert Baith transferred their interest in Arlington Drive to Brion and Lisa in 2007, that she would no longer be liable on the Arlington loan. Karen's counterclaim provided the following statement in explanation:

> Defendant, Karen Baith, further states that her husband was a signor on said loan to Lisa and Brion Baith on the Arlington Drive property, that he is now deceased and [First Federal] released him from liability after his interest in the real property was transferred to Lisa and Brion Baith. Likewise, when Karen Baith transferred the property to Lisa and Brion Baith, she *should have been released* of liability on said note and indebtedness by the actions and acquiescence of [First Federal].

(emphasis added). She argued that First Federal was "breaching its obligation to her and should be estopped from collecting any monies."

On May 26, 2011, First Federal moved for summary judgment. Karen Baith opposed the motion. In her opposition, Karen Baith argued promissory estoppel, claiming that the memorandum calling her a "guarantor" was "evidence that the Bank should be estopped from denying a change in her status as primary obligor [on the Arlington loan]." Karen claimed that "the Bank at some point

after 2005 and at latest in December of 2009 made a promise to [her] that she would no longer be primarily liable as a maker of the [Arlington loan]." She argued that the Curtis memorandum "evidenced" this change in status by referring to Karen as a "guarantor" on the Arlington loan. Karen argued that she relied on her belief that her status had changed to her detriment. Specifically, she argued that she would have been more proactive in safeguarding the Arlington investment and would have insisted on a receiver being appointed to manage the Arlington apartment. Karen argued that she suffered injustice as a result because the rent at the Arlington apartment building went uncollected and the building was mismanaged, resulting in foreclosure.

Karen also added an "impairment of collateral" argument, arguing that "the Bank should be estopped from claiming recourse against Karen Baith . . . as a result of [First Federal's] unjustified impairment of collateral." She argued that First Federal had a duty to her, a guarantor, not to impair the value of the collateral.

On August 11, 2011, the district court granted summary judgment for First Federal. The court granted the motion with regard to Brion and Lisa, who had not responded to First Federal's claims.

With regard to Karen's claims, the court noted that the Michigan Statute of Frauds does not allow actions against banks or other financial institutions that are based on the bank's oral promises. *See* MICH. COMP. L. (M.C.L.) § 566.132(2). That statute states:

> An action shall not be brought against a financial institution to enforce any of the
> following promises or commitment of the financial institution unless the promise or
> commitment is in writing and signed with an authorized signature by the financial
> institution:
> . . .

> (b) A promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation.

M.C.L. § 566.132(2).

The district court determined that Karen had not submitted evidence to satisfy M.C.L. § 566.132(2) because she had provided no writing signed by First Federal stating that she would no longer be held liable as an obligor on the Arlington loan, or that she was being made a guarantor rather than an obligor. Therefore, the district court determined that she was still liable on the loan.

The district court next addressed Karen's promissory-estoppel claim. The court determined that, "[i]n context, [the Curtis] memorandum cannot reasonably be interpreted as a promise made to Karen Baith that would remove her as a prime borrower on the [Arlington loan]." The court noted that Baith had signed two official written documents from First Federal—the 2005 Arlington loan agreement and the 2009 Change in Terms Agreement. The Change in Terms Agreement, which removed Robert Baith as an obligor on the Arlington loan, exhibited the formality with which First Federal removed a borrower from his obligation on a promissory note. The district court determined that it was not reasonable for Karen to believe that Curtis's casual memorandum, merely mentioning her as a "guarantor," could have been meant to remove her as an obligor on the Arlington loan. Without a promise, which she had not shown, the district court held Karen had no promissory-estoppel claim.

The district court did not discuss the affirmative defenses Karen Baith listed in her answer to the complaint, nor did it discuss her impairment-of-collateral argument.

The Baiths filed this timely appeal. Though named as parties in the appellate record, Brion and Lisa Baith do not present any claims. Karen Baith alone presents arguments.

II

We review the district court's grant of summary judgment de novo. Reviewing the evidence in the light most favorable to the non-moving party, summary judgment should only be granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

On appeal, Karen Baith argues that the Michigan Statute of Frauds, M.C.L. § 566.132(2), does not apply in this case. She states that First Federal approached her "on several different occasions in 2009" to try to get her to execute a cross-collateralization agreement. App'ant Brief at 10. She claims that First Federal told her that if she agreed to the cross-collateralization agreement she would be released from her obligation as a borrower on the Arlington loan. *Ibid.* She argues that the Curtis memorandum reflected and memorialized the parties' oral agreement, and that this "memorialization of a prior oral agreement" is an exception to M.C.L. § 566.132(2). *Id.* at 11 (citing *Adolph v. Cookware Co. of Am.*, 278 N.W. 687, 689 (Mich. 1938)).

Baith's argument is meritless. First and foremost, *Adolph*, the only case Baith cites in support of her argument, actually stands for a separate point of law. *Adolph* dealt with an oral business arrangement between a chiropractor, Adolph, who lived in Georgia, and a book publisher, Burnette, who lived in Tennessee. *Adolph*, 287 N.W. at 687. In a series of letters, Adolph and Burnette agreed that Adolph would write a book for Burnette's company for $25 per week. Burnette

then wrote Adolph that he wished Adolph to assume the position of head of the "health extension department" of the publishing company. *Id.* at 688. Adolph arrived in Tennessee, and the series of letters ended. According to Adolph's testimony, he and Burnette then negotiated orally regarding Adolph's pay as head of the health extension department. Eventually Burnette orally agreed to pay Adolph 2% of the corporation's gross sales. *Id.* at 689. However, this agreement was never reduced to writing. Burnette then left on a trip to Europe. Adolph then had "disputes" with Burnette's secretary that led, several months later, to his discharge. Adolph brought a breach-of-contract suit. The trial court directed a verdict for the defendant because the parties did not have an enforceable contract under the Statute of Frauds.

On appeal, the Michigan Supreme Court reversed, because Adolph's testimony, taken as true, showed an employment contract for an *indefinite period*. This fell within a recognized exception to the Statute of Frauds—contracts that can feasibly be performed in less than one year. *Id.* at 689 (citing *Smalley v. Mitchell*, 68 N.W. 978, 979 (Mich. 1896)). This was the exception that led to the case's reversal, not, as Baith argues, that a subsequent writing memorializing a prior oral agreement precludes the operation of the Statute of Frauds. Whether the contract between the parties was complete, with the subsequent writing merely memorializing the terms, was a question for the jury, but the case was reversed and sent back to a jury because the contract could be performed in less than one year. *Ibid.*

The fact that Baith misunderstood the significance of *Adolph* is also reflected in the case's citing history. *Adolph* has not been cited for the proposition that it is an exception to the Statute of Frauds if a plaintiff can provide a writing that memorializes a prior oral agreement. The case has

only been cited for its actual holding, that terminable-at-will contracts are not governed by the Statute of Frauds since they may be terminated less than a year after they are made. *Adolph*, 278 N.W. at 689; *see, e.g.*, *Bullock v. Auto. Club of Mich.*, 444 N.W. 2d 114, 137 (Mich. 1989)*; Rowe v. Noren Pattern & Foundry Co.*, 283 N.W.2d 713, 715 (Mich. App. 1979).

Moreover, Baith's argument resembles a promissory-estoppel argument. Baith argued promissory estoppel below. She does not explicitly renew a promissory-estoppel argument on appeal, but her interpretation of the *Adolph* case seems to grasp at the same principles. Such an action must fail. Promissory-estoppel actions, unless they are supported by signed writings, are barred by M.C.L. § 566.132(2). *Blackward Props., LLC v. Bank of Am.*, No. 10-2226, 2012 WL 762882, at *3 (6th Cir. Mar. 9, 2012) (deciding that the Michigan Supreme Court would follow the Michigan intermediate courts in holding that M.C.L. § 566.132(2) bars a claim for promissory estoppel); *Crown Tech. Park v. D&N Bank, FSB*, 619 N.W.2d 66, 72 (Mich. Ct. App. 2000); *FEI Co. v. Republic Bank, S.E.*, Docket No. 268700, 2006 WL 2313612, at *2 (Mich. Ct. App. Aug. 10, 2006) ("M.C.L. § 566.132(2) contains an unqualified and broad ban thereby eliminating the possibility of creative pleading to avoid the ban. Claims of negligence and promissory estoppel against a financial institution are among those barred.") (internal quotation marks and citation omitted).

The Michigan Statute of Frauds bars *any* action, including a promissory-estoppel action against a financial institution when the plaintiff fails to provide a written, signed promise from the financial institution. *See* M.C.L. § 566.132(2). Therefore, any action brought by Baith would fail

without a written, signed promise from First Federal that she would no longer be an obligor on the Arlington loan. She has presented none.

Next, Baith argues that her case falls within a different exception to the Statute of Frauds—that partial performance removes one from the Statute of Frauds. App'ant Brief at 13. Baith argues that she partially performed her "new loan agreement" with First Federal by "agree[ing] to enter into a cross–collateralization with the bank." *Id.* at 14. In support of her argument, Baith cites a contracts treatise and a single case, *Boelter v. Blake*, 12 N.W.2d 327 (Mich. 1943).

Baith's argument is likely barred by M.C.L. § 566.132(2), since Michigan courts have made it clear that the provision's reference to "any action" should be read as broadly as possible. *See, e.g.*, *FEI Co.*, 2006 WL 2313612, at *2. The only case that Baith cites, *Boelter v. Blake*, 12 N.W. 2d 327 (1943), predates the 1992 revision of M.C.L. § 566.132 to its present language. The statute in 1943 did not contain a provision similar to today's § 566.132(2).

However, we do not need to attempt to divine Michigan's answer to whether an equitable action for partial performance would defeat the plain language of M.C.L. § 566.132(2). Baith did not present the argument of partial performance in her answer to First Federal's complaint or in her opposition to summary judgment. Baith has waived her argument by failing to present it to the district court; accordingly, we decline to reach the merits. *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1172 (6th Cir. 1996) ("Issues that are not squarely presented to the trial court are considered waived and may not be raised on appeal.").

Finally, Baith argues that the district court erred when it granted summary judgment to First Federal without considering her affirmative defense and counterclaim of negligence and impairment

of collateral. App'ant Brief at 14. Baith makes reference to her fifth, sixth, and seventh affirmative defenses to show that she pleaded impairment of collateral, and the first paragraph of her counterclaim, which states that the counterclaim "adopts all of the statements and allegations in the foregoing Answer including the Affirmative Defenses." App'ant Brief at 15. Baith's argument is flawed on several levels and must fail.

First, Baith's fifth, sixth, and seventh affirmative defenses did not mention "impairment of collateral." They in fact were titled as follows: (5) "Lack of Cooperation/Breach of Contract/Duty," arguing that First Federal increased her liability and exposure by refusing to allow a payoff of the Arlington loan; (6) "Failure of Notification," arguing that First Federal increased her exposure because it "did not keep her apprised" of her responsibility and "did not properly supervise the loan" because it should have appointed a Receiver; and (7) "Failure to Execute Against Guarantor," arguing that by releasing Robert Baith from liability after his death, First Federal "impliedly released Karen Baith from the same obligation and/or increased her risk." These affirmative defenses do not give the court notice of an "impairment of collateral" argument; further, Baith cited no law regarding impairment of collateral. It is not reasonable to suggest that the district court should have addressed impairment of collateral based on these defenses.[3]

---

[3]Baith argued that she also asserted impairment of collateral in her counterclaim. However, she cites only to the first paragraph of the counterclaim, which stated that it incorporated the arguments made in her affirmative defenses. Because Baith did not properly assert or support an impairment-of-collateral claim in her affirmative defenses, then, she also failed to assert it in her counterclaim.

Baith did make an "impairment of collateral" argument in her opposition to summary judgment. ("[T]he Bank should be estopped from claiming recourse against Karen Baith . . . as a result of the Bank's unjustified impairment of collateral."). However, Baith made this argument specifically as relates to her as a guarantor on the Arlington loan, not as an obligor. ("Karen Baith *as a guarantor* necessarily enjoys additional protection from impairment of collateral under both the common law and the UCC.") (emphasis added). The district court found that Baith was *not* a guarantor on the Arlington Loan, but rather, at the loan's inception and throughout, an obligor. Because the district court correctly determined that Baith was an obligor on the Arlington loan, it did not err in declining to address her impairment-of-collateral argument, which was explicitly based on Baith having guarantor status.[4]

### III

For the foregoing reasons, the district court's judgment is AFFIRMED.

---

[4]Moreover, Baith made the impairment-of-collateral argument within her larger promissory-estoppel argument—she argued that the bank promised her she was a guarantor, that it owed a duty to refrain from impairing the collateral to her, the guarantor, that she relied, and that the bank breached its duty to her, as a guarantor, not to impair the value of the collateral. As discussed above, M.C.L. § 566.132(2) prohibits a promissory-estoppel action against the bank unless the plaintiff can show a signed writing from the bank. The district court did not entertain Baith's promissory-estoppel arguments for that reason; therefore, it was also not error to decline to address impairment of collateral, which was interwoven with her promissory-estoppel argument.