LYLE *v.* MUNSON.

1. SPECIFIC PERFORMANCE—ORAL AGREEMENT FOR SALE OF LAND
—ADMISSIBILITY OF VOID WRITTEN CONTRACT — EVIDENCE —
LEASES—SUNDAY CONTRACT.

In a suit for the specific performance of a contract for the
sale of land, where plaintiff relied both in his pleadings
and proofs upon a written agreement signed by the parties
and also upon a parol agreement of like tenor preceding
it, alleged to be validated by taking possession of the
premises and other acts, said written agreement was
proper to be considered for the purpose of throwing light
upon the oral agreement, although void because executed
on Sunday.

2. SAME—LEASES—VENDOR AND PURCHASER—OPTION OF PURCHASE.
Plaintiff's claim that the oral agreement was for a lease for
two years with the option of purchase "on or before" the
expiration of the lease, the written contract containing
the same provision, *held,* sustained by the record, notwith-
standing defendant's testimony that it only gave the right
of purchase at the end of the two years.

3. FRAUDS, STATUTE OF—ORAL LEASE VALID FOR ONE YEAR ONLY.
An oral agreement for the lease of land for two years with
the option of purchase was a valid lease for one year only.

4. SAME—ORAL AGREEMENT FOR SALE OF LAND—PART PERFORM-
ANCE.

The right of purchase which ran with said oral lease was
relieved of the statute of frauds by possession and part
performance.

5. SAME—ORAL AGREEMENTS RELATIVE TO LAND—PART PERFORM-
ANCE.

Section 11979, 3 Comp. Laws 1915, recognizes and preserves
the power of chancery courts to compel specific perform-
ance of oral agreements relative to real estate in case of
part performance.

6. SPECIFIC PERFORMANCE—ORAL CONTRACT FOR SALE OF LAND—
FRAUD—PART PERFORMANCE—SUNDAY CONTRACT.

Where defendant orally agreed with plaintiff to enter into

a written lease of land for two years with the option of
purchase on or before the expiration of same, in reliance
upon which plaintiff went into possession and partly per-
formed, and defendant, though mistakenly as he claims,
executed said lease on Sunday, which rendered it void,
said act was, nevertheless, a fraud upon plaintiff, and he
is entitled to specific performance of said oral agreement,
upon tender of the agreed price, in a court of chancery.

7. SAME — EQUITY — PART PERFORMANCE — FRAUD — ESTOPPEL
—FRAUDS, STATUTE OF.
    Part performance, while an essential in the test, does not
    in itself comprehend the whole doctrine of equitable re-
    lief in this class of cases; misleading, fraudulent conduct
    by act or acquiescence is the underlying thought which
    moves the chancery court under the principle of equitable
    estoppel to deny resort to the statute of frauds as an in-
    strument of fraud.

Appeal from Saginaw; Snow (Ernest A.), J. Sub-
mitted January 6, 1921. (Docket No. 48.) Decided
March 30, 1921.

Bill by William Lyle against William C. Munson for
the specific performance of a land contract. From a
decree dismissing the bill, plaintiff appeals. Reversed,
and decree entered for plaintiff.

*Cook & Cook,* for plaintiff.

*Bird J. Vincent,* for defendant.

STEERE, C. J.   Plaintiff filed this bill for specific per-
formance of an agreement relating to a tract of land
of between 16 and 17 acres in the township of Buena
Vista, Saginaw county, located near the city of Sagi-
naw.   Early in 1919 plaintiff learned from a sister of
defendant that he owned the property and it was for
sale.   He thereafter interviewed defendant upon the
subject who replied he owned the property and it was
for sale at $3,500.   Stating that he was not then just

ready to buy plaintiff proposed to lease the place for a term of years with the privilege of purchase on or before the expiration of the lease. Negotiations were had between the parties along that line resulting in an oral agreement by which defendant leased the property to plaintiff for two years at an annual rental of $300 with a privilege of purchasing the same for $3,500, before or at the expiration of his lease, promising to have the contract put in writing by his son-in-law, named McDonald, who was a justice of the peace, and in the meantime gave plaintiff possession of the property which was then vacant.

The oral agreement between the parties was reached the latter part of February and on March 12th plaintiff took possession of the property, fixed up the old house upon it and established his home there, remaining in possession and claiming the property as his own up to the time of the hearing in this case. He several times asked for his written contract, but there was delay in drawing up the papers, as to which the latter renewed his promise and excused the delay on the ground that his son-in-law, McDonald, had been otherwise busy and not yet able to attend to it. Plaintiff also asked McDonald about defendant having him draw up the papers, and the latter made suggestion as to some change in the terms of their agreement which plaintiff objected to. He then informed defendant of McDonald's proposal and told him that unless the agreement was to be carried out exactly as they made it he would have nothing more to do with the matter. To this defendant replied, as he himself testified, "I told him it would be just as it was stated in the first place."

The matter dragged along until the fore part of April when plaintiff went to McDonald's home, where defendant was staying, and McDonald then drew up the lease in duplicate while both parties were present,

read it to them and both signed it, he signing as a witness. It bears date April 7, 1919. McDonald used a printed short form of lease with the customary provisions of such an instrument, filling in with a pen the appropriate blank spaces giving description of the property, date, names of the parties, annual rental of $300, and two years' duration of the lease. There was no printed clause in the blank form relative to privilege of purchase. This provision McDonald formulated and wrote out as a separate paragraph in a blank space following the clause covering time, rate of rent, etc., as follows:

"Provided further, that said party of the second part shall on or before the expiration of this lease have the privilege of buying said above described property for the sum of three thousand five hundred dollars ($3,500)."

After taking possession of the property plaintiff proceeded to clean up the premises in and around the house—painting, cutting brush, removing rubbish, etc. He took steps to construct a barn and hog-pen, obtained and had upon the place sufficient material ready for their construction, consisting of lumber, scantling and timbers, and had set posts in the ground preparatory to building the hog-pen.

During the early summer of 1919 a real estate operator who had procured some suburban land in that vicinity with a view to platting it, talked with plaintiff, defendant and defendant's son-in-law, McDonald, about buying this property. He testified plaintiff said he was willing to sell the rear acreage of 12½ acres for $3,000, retaining four acres off the front. Defendant claimed a "gentleman's agreement" was there made, in which plaintiff participated, to sell him the property at a price "considered satisfactory to them" and testified that after plaintiff had tendered him "the money for the place" people representing this real

estate operator offered defendant $5,500 for the property.

In June plaintiff notified defendant of his election to purchase the property under the terms of his lease, asking for deed and abstract. This was not complied with and he made a formal tender of a deed for execution with the purchase price ($3,500) about the last of July, "on the 28th or 29th," as defendant fixes the time tender was made him, which he refused, giving "good and sufficient reasons," as he alleges in his answer. Soon after his refusal to accept the tender and execute a deed this bill was filed asking for specific performance.

Plaintiff in his pleadings and proofs based his right to relief on both the written agreement signed by the parties and the parol agreement of like tenor preceding it, alleged to be validated against the statute of frauds by taking possession of the premises with other acts of performance and tender of the agreed purchase price. Defendant denied the validity of the oral agreement under the statute of frauds, except as a lease of the premises for not exceeding one year, and of the written agreement admittedly signed by him because executed on Sunday, concisely stating the substance of his defense in his answer as follows:

"Defendant avers that he did not, on the execution of said lease, nor any time since said date, and does not now consider himself legally bound to perform any of the terms and agreements by him made, as set forth in said lease, and does hereby repudiate all such agreements."

The case was heard on pleadings and proofs taken in open court resulting in dismissal of plaintiff's bill. April 7, 1919, the date the written instrument bears, fell on Monday. On its face it is a valid, enforceable contract. Its preparation by defendant's agent, execution and delivery were in belated performance of de-

fendant's promise to give plaintiff a written lease containing the exact terms of their oral agreement made in February under which he gave plaintiff possession of the premises. In repudiation and denial of its validity defendant testified that it was executed on Sunday, April 6th, in the forenoon. McDonald, his wife and son, a boy 16 years of age, also testified that the transaction took place on Sunday, April 6th, in the forenoon. They, with defendant and plaintiff, were the only parties at McDonald's home when the transaction took place. Plaintiff testified it was drawn up and executed on the date it bears, Monday, April 7th, in the evening before supper, he stopping at McDonald's house for that purpose on his way home after finishing his day's work. His wife testified that on the day before, Sunday, April 6th, plaintiff was at home all the forenoon and until after dinner. The trial court held the instrument void because executed on Sunday, saying in part:

"The great weight of the testimony shows that the contract or the lease was executed on that day. The court has confidence in the testimony of witnesses who have testified to its execution on Sunday—witnesses who are personally known to the court, and in whom the court has confidence with respect to their veracity."

To one not having personal acquaintance with and favored by extra-judicial information as to the veracity of defendant and his witnesses there is much in the record to raise a doubt as to whether the presumption of accuracy imputable to a solemnly executed instrument in writing has been conclusively overcome.

But accepting the decision of the court that the instrument is void as an agreement in writing because executed on Sunday and passing to the question of their previous oral agreement, this writing deliberately signed by the parties under the belief that it was a binding contract between them is in the case, in evi-

dence and under the circumstances proper to be considered in so far as such notations upon the subject, signed by them, throw light on the oral agreement they had previously made and acted upon.

As to the actual terms of their oral agreement there is but one point of possible conflict. It is undisputed that plaintiff on hearing the property was for sale went to defendant with that in mind to ascertain his price and terms. He first asked him if it was for sale and the price. Then stating he was not just ready to buy he asked if it could be leased with privilege of buying, which defendant answered favorably. Their negotiations resulted in a contract of lease for two years with privilege of purchase "on or before" the expiration of the lease as plaintiff testified, and is stated in the claimed void written agreement defendant subsequently had prepared and gave plaintiff. But defendant in his testimony limited that privilege to "the end of two years." Upon that point he testified on cross-examination in part as follows:

"When Mr. Lyle came to me I offered the property to him—offered to sell it to him.

"*Q.* And the result of your negotiations with Mr. Lyle were that you finally agreed to lease it to him for two years at a rental of $300 a year?

"*A.* Yes, sir.

"*Q.* With an option in it to purchase at $3,500 at any time during the two years that he might—

"*A.* No, sir. * * *

"*Q.* Wasn't your agreement with him to the effect that he could buy this property at a certain figure?

"*A.* He could buy it at the end of two years.

"*Q.* At the end of two years?

"*A.* Yes.

"*Q.* That was your agreement with him?

"*A.* Yes.

"*Q.* And that agreement was made prior to the time you put the contract in writing?

"*A.* Yes.

"*Q.* And when Mr. Lyle met you on the street one

day and said Mr. McDonald had been objecting to the making of the contract you told him to go on, you would go through with your bargain that you made with him in reference to it, is that right?

"A. Yes.

"Q. And that was prior to April 6th?

"A. Prior to April 6th. At this time I also promised I would give him a written contract with reference to it, and that as soon as Justice McDonald had time to draw the contract it would be drawn and signed."

The writing defendant had promised and gave plaintiff was prepared under his immediate direction by McDonald, the scrivener he selected, a relative, school teacher and justice of the peace, who had "tried a good many cases on various points," was equipped with experience and proper blanks, and testified he had not before then ever talked over with plaintiff the terms of the contract he drafted. McDonald's wife, who was "in and out" of the room while he was preparing the papers, testified that "he was asking as he went along, so he would understand what they wished put in, to have it as near right as they wished." When prepared it was read to the parties, approved and signed by them. This writing was in effect defendant's own act, signed by him but a little over a month after their parol agreement, in keeping with his promise to put that agreement in writing, "just as was stated in the first place." Its purpose was not a new agreement, but to put the terms of the one previously made into writing. The clause giving plaintiff the privilege of purchase on or before expiration of the lease was a special and prominent feature of the instrument, distinctively written by McDonald with a pen as a separate paragraph. It clearly expressed the thought in plain and unmistakable words. The record as a whole is convincing that the terms of the oral agreement were as plaintiff testifies and this writing

shows, and defendant's testimony that it only gave right of purchase at "the end of two years" was but a clumsy afterthought.

The one agreement combined a right of tenancy and right of purchase. Though oral the right of tenancy was good for a year, and the right of purchase which ran with it was relieved of the statute of frauds by possession and part performance. Plaintiff was at no time in default. Put in possession of the premises by defendant under their oral agreement, he established his home there, continued in possession, made improvements, accumulated material and prepared to erect buildings, declared his election to purchase, seasonably notified defendant of his readiness to perform, and when defendant declined to perform on his part tendered the agreed purchase price with deed for execution, followed on refusal by this bill for specific performance and payment into court of the rent then falling due, and has kept the tender good.

Having found the written contract void because executed on Sunday, the trial court said of the preceding verbal contract under which defendant delivered possession to plaintiff: "There was not such part performance of said oral agreement, and not such meeting of the minds of the parties in the terms of such oral agreement that will justify a court of equity in enforcing performance."

The clearly proven terms of that agreement are plain, simple and readily understandable to a person of ordinary intelligence. There is no claim that defendant was misled or deceived by anything plaintiff said or did in the negotiations leading up to the agreement. He had lived upon this property and presumably knew more about it than plaintiff. Both men lived in Saginaw and were men of mature years, no disparity is shown in their station in life, ability or business experience. Defendant was a machinist, working for

the Pere Marquette railroad, and plaintiff worked at sidewalk construction.

Told by a relative of defendant that the property was for sale and he owned it, plaintiff interviewed defendant on the subject, first asking him if such was the fact and his price. Defendant's wife had died not long before, he wanted to dispose of the property, had offered it for sale and not yet found a purchaser. There is no evidence that the price he asked for it was less than its then fair market value. From a prospective purchaser, not then ready to buy, plaintiff's proposal to lease with the privilege of buying at defendant's price was not an unnatural offer for him to make, or for defendant to accept upon the basis of a fair rate of interest on the price he asked for the property in the meantime. It was not a hasty deal. The subject was discussed in more than one interview. After its terms were fully agreed to, as a precaution before acting upon it and taking possession, plaintiff again interviewed defendant and went over the subject with him, refusing to take any steps or to have anything to do with the place unless he should have it "just as the bargain was made." Defendant then reassured him with instructions to get the key and move in, promising "to give him a written contract with reference to it." We think the evidence clearly establishes that the minds of the parties met on the agreement, and the mutual expectation that plaintiff would buy the property, as was agreed he might, was a prominent factor in the minds of both parties at the time.

This contract is complete, certain and definite in all its essential particulars. Section 11979, 3 Comp. Laws 1915, in the chapter on fraudulent conveyances and contracts, distinctly recognizes and preserves the power of our chancery court to compel specific performance of oral agreements relative to real estate in

case of part performance. Many cases are cited in the annotation of that section, discussing circumstances and essentials of part performance which fall within the purview of equitable consideration. The essentials of part performance are shown here, encouraged and performed in the main after execution and delivery of a promised written contract containing the terms of their oral agreement under which possession was delivered and taken. This instrument is fair on its face and valid as it reads but, as defendant maintained, falsely dated and void because executed on a *dies non*. Accepting as true the claim of defendant and his scrivener that they then did not know a contract executed on Sunday was void, if an honest mistake it nevertheless operated as a fraud upon plaintiff, misleading him to his harm. Part performance, while an essential in the test, does not in itself comprehend the whole doctrine of equitable relief in this class of cases. Misleading, fraudulent conduct by act or acquiescence is the underlying thought which moves the chancery court under the principle of equitable estoppel to deny resort to the statute of frauds as an instrument of fraud. The question is not alone one of part performance, but as said in *Meach* v. *Perry*, 1 Chip. (Vt.) 182:

"Does the part performance, with the attending circumstances, make a case of fraud, against which a court of equity ought to relieve?"

We think this case falls within that rule. The decree of the court below will be vacated, with costs to plaintiff, and a decree entered for specific performance as prayed for; also containing in substance the provision in the former decree directing the clerk of the circuit court to pay defendant the amount of rent due August 1, 1919, deposited with the court by plaintiff.

MOORE, WIEST, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.