# Order

**Michigan Supreme Court**
**Lansing, Michigan**

June 29, 2018

155498

NORTH AMERICAN BROKERS, LLC,
and MARK RATLIFF,
             Plaintiffs-Appellees,

v

HOWELL PUBLIC SCHOOLS,
             Defendant-Appellant,

and

ST. JOHN PROVIDENCE,
             Defendant.
_____/

Stephen J. Markman,
*Chief Justice*

Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Kurtis T. Wilder
Elizabeth T. Clement,
*Justices*

SC: 155498
COA: 330126
Livingston CC: 15-028669-CH

On April 12, 2018, the Court heard oral argument on the application for leave to appeal the February 9, 2017 judgment of the Court of Appeals. On order of the Court, the application is again considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.

MCCORMACK, J. (*concurring*).

The equitable principle of estoppel is many centuries old. Under the doctrine, a promise that the promisor should reasonably expect to produce action or inaction from its recipient may be binding if justice so requires. See Restatement Contracts, 2d, § 90. Its age highlights its staying power. Over the years, it has been widely adopted, easily applied, and narrowly tailored. I agree with the Court that we should decline an invitation to disassemble it today.

The English Parliament adopted the first statute of frauds in 1677. Note, *Statute of Frauds—The Doctrine of Equitable Estoppel and the Statute of Frauds*, 66 Mich L Rev 170, 170 (1967). The enactment of the statute was largely driven by concerns unique to the seventeenth century. As Sir William Holdsworth explains, at that time, tangible evidence of agreement was necessitated by the virtually unfettered discretion given to juries. 6 Holdsworth, A History of English Law (1924), p 388. Nothing prevented juries from receiving independent information on cases, and motions for a directed verdict were relatively new and untested at the time. *Id*. Additionally, the witness testimony that juries could hear was tightly restricted, as neither the parties to an action nor any parties interested in the outcome of the action were considered competent witnesses. *Id*. Within this framework, the statute of frauds played the important role of ensuring that juries

were not provided false information regarding contracts that had never been formed.[1]

From the very beginning of British jurisprudence relating to the statute of frauds, British courts have applied equitable rules to enforce promises that induced a party to act in reliance. Costigan, Jr., *The Date and Authorship of the Statute of Frauds*, 26 Harv L Rev 329, 343 (1913). The British Court of Chancery would regularly apply these equitable rules, particularly equitable estoppel and specific performance, "if insistence on the letter of the statute would facilitate a fraud." 6 Holdsworth, p 393. From its inception, then, there was agreement that exceptions to the statute of frauds were needed in order to prevent the statute itself from perpetuating frauds. The trend crossed the pond. Today, promissory estoppel is employed in every variety of United States court. See 48 ALR 2d 1069.

Michigan is no outlier. Our Legislature passed the first statute of frauds in 1838, just after statehood, 1838 RS, pt 2, tit vi, ch 1, and before that, a statute of frauds could be found in Michigan's territorial laws, 1 Territorial Laws, Act of December 7, 1819, § 10, p 467. And this Court has applied the doctrine of equitable estoppel for nearly a century to prevent the statute from becoming "an instrument of fraud." *Lyle v Munson*, 213 Mich 250, 260 (1921); see also *Jones v Pashby*, 67 Mich 459, 462 (1887) ("[A] parol agreement under such circumstances would act as an estoppel, if acquiesced in for years, and the statute of frauds would not intervene to prevent the enforcement of such estoppel."). We have reaffirmed that principle time and time again. *Brummel v Brummel*, 363 Mich 447, 452 (1961) (citing cases). So too has the Legislature. Since 1921, the Legislature has amended the statute of frauds three times and never repudiated

---

[1] As rules of evidence developed to address many of the concerns that gave rise to the statute of frauds, the statute came under criticism as unnecessary or dangerous. See Epstein, Starbird & Vincent, *Reliance on Oral Promises: Statute of Frauds and Promissory Estoppel*, 42 Tex Tech L Rev 913, 928 (2010) ("[The Statute of Frauds] remained the law in England until 1954 when most of its provisions were repealed so that it applies only to land contracts and guarantees. According to Professor John Krahmer of Texas Tech University School of Law, England abolished the statute of frauds 'for being superfluous and irrelevant.' While the statute of frauds has been virtually eliminated from the law of contracts in England, it remains an important (albeit long unpopular) part of the law of contracts in the United States."); Summers, *The Doctrine of Estoppel Applied to the Statute of Frauds*, 79 U Penn L Rev 440, 442 (1931) (" 'The special peculiarity of . . . the Statute of Frauds is that it is in the nature of things impossible that it ever should have any operation, except that of enabling a man to escape from the discussion of the question whether he has or has not been guilty of a deliberate fraud by breaking his word.' "), quoting Pollock & Stephens, *Section Seventeen of the Statute of Frauds*, 1 L Q Rev 1 (1885).

the statute's estoppel-based exceptions. 1945 PA 261; 1974 PA 343; 1992 PA 245.[2] When the Legislature reenacts a statute, we presume it did so with an understanding of the court's interpretation of it. See *Anzaldua v Band*, 457 Mich 530, 544 (1998), citing *Lorillard v Pons*, 434 US 575, 581 (1978). The doctrine has withstood the tests of time, and legislative and judicial scrutiny.

More recently, this Court affirmed promissory estoppel in *Opdyke Investment Co v Norris Grain Co*, 413 Mich 354 (1982). There we declined to adopt "narrow and rigid rules for compliance with the statute of frauds." *Id*. at 367. Instead, we unanimously held that "recovery based on a noncontractual promise falls outside the scope of the statute of frauds" and that the plaintiff's claim of promissory estoppel required the denial of the defendant's summary disposition motion. *Id*. at 370. This conclusion was necessary to "avoid the arbitrary and unjust results required by an overly mechanistic application of the rule." *Id*. at 365.[3]

We have considerable company. Three-fifths of the states apply promissory estoppel in some fashion despite the statute of frauds.[4] And only a handful of states have

---

[2] The 1992 revision added a section that the Court of Appeals has interpreted to prevent promissory estoppel from applying to suits against financial institutions. See *Crown Tech Park v D&N Bank, FSB*, 242 Mich App 538, 550 (2000).

[3] And the Chief Justice has recognized another equitable doctrine, partial performance, as creating an exception to the statute of frauds. *Vittiglio v Vittiglio*, 493 Mich 936, 936-937 (2013) (MARKMAN, J., concurring) ("[I]t is ultimately correct that plaintiff is bound by the settlement . . . [because] defendant gave plaintiff a check for $1.2 million in reliance on the settlement agreement, which was sufficient partial performance to take the oral settlement out of the statute of frauds and render it enforceable.").

[4] *Kiernan v Creech*, 268 P3d 312, 316 (Alas, 2012); *Mullins v Southern Pacific Transp Co*, 174 Ariz 540, 542 (1992); *Ralston Purina Co v McCollum*, 271 Ark 840, 844 (1981); *Garcia v World Savings, FSB*, 183 Cal App 4th 1031, 1040 n 10 (2010); *Kiely v St Germain*, 670 P2d 764, 769 (Colo, 1983); *Taylor v Jones*, unpublished memorandum opinion of the Delaware Court of Chancery, issued December 17, 2002 (Case No. 1498-K); *Tauber v Dist of Columbia*, 511 A2d 23, 27 (DC App, 1986); *20/20 Vision Ctr, Inc v Hudgens*, 256 Ga 129, 135 (1986); *McIntosh v Murphy*, 52 Haw 29, 35 (1970); *Brown v Branch*, 758 NE2d 48, 52 (Ind, 2001); *Kolkman v Roth*, 656 NW2d 148, 153 (Iowa, 2003); *Bittel v Farm Credit Servs of Central Kansas*, 265 Kan 651, 659 (1998); *Snyder v Snyder*, 79 Md App 448 (1989); *Barrie-Chivian v Lepler*, 87 Mass App Ct 683, 685 (2015); *Del Hayes & Sons, Inc v Mitchell*, 304 Minn 275, 285 (1975); *Alpark Distrib, Inc v Poole*, 95 Nev 605, 608 (1979); *Eavenson v Lewis Means, Inc*, 105 NM 161 (1986), overruled on other grounds by *Strata Prod Co v Mercury Exploration Co*, 121 NM 622, 627-628 (1996); *In re Hennel Estate*, 29 NY3d 487, 494 (2017); *Home Elec Co of Lenoir,*

explicitly forbidden the use of promissory estoppel as an exception to the statute of frauds. The dissent's canvass of the several states makes the case that abandoning promissory estoppel remains a distinctly minority position.

And even the cases the dissent cites do not uniformly support its position. The dissent cites *Tiffany Inc v WMK Transit Mix, Inc*, 16 Ariz App 415, 421 (1972), for the proposition that promissory estoppel would nullify the statute of frauds. *Tiffany* is an intermediate court decision from Arizona, but the Arizona Supreme Court has held promissory estoppel may be applied to defeat the statute of frauds where "there is a second promise not to rely on the statute." *Mullins v Southern Pacific Transp Co*, 174 Ariz 540, 542 (1992). The cases the dissent cites from Maine and Washington are also unhelpful: *Stearns v Emery-Waterhouse C*o, 596 A 2d 72 (Me, 1991) and *Greaves v Med Imaging Sys, Inc*, 124 Wash 2d 389 (1994). Although each case is evidence that promissory estoppel is not an immutable exception to the statute of frauds in those jurisdictions, neither has done away with the doctrine altogether (as the dissent would have us do here). *Harvey v Dow*, 962 A2d 322, 327 (Me, 2008) (applying promissory to an agreement to transfer land); *Klinke v Famous Recipe Fried Chicken, Inc*, 94 Wash 2d 255, 260 (1980) (applying promissory estoppel to restaurant franchise agreement). If there is any wisdom to be found in majorities, we should not rush to abandon promissory estoppel.

And then there's stare decisis.[5] We don't overrule precedent lightly. Our test for determining whether to overrule *Opdyke* has us consider these factors: (1) "whether the earlier decision was wrongly decided," (2) "whether the decision at issue defies practical workability," (3) "whether reliance interests would work an undue hardship," and (4)

---

*Inc v Hall & Underdown Heating & Air Conditioning Co*, 86 NC App 540, 543 (1987), aff'd 322 NC 107 (1988); *Knorr v Norberg*, 872 NW2d 323, 326 (ND, 2015); *Olympic Holding Co, LLC v ACE Ltd*, 122 Ohio St 3d 89, 96 (2009); *Lacy v Wozencraft*, 188 Okla 19 (1940); *Potter v Hatter Farms, Inc*, 56 Or App 254, 262 (1982); *Brochu v Santis*, 939 A2d 449, 453 (RI, 2008); *Durkee v Van Well*, 654 NW2d 807, 815 (SD, 2002), overruled in part on other grounds by *Mundhenke v Holm*, 787 NW2d 302, 306-307 (2010); *Shedd v Gaylord Entertainment Co*, 118 SW3d 695, 699-700 (Tenn App, 2003); *"Moore" Burger, Inc v Phillips Petroleum Co*, 492 SW2d 934, 937-938 (1972); *Stangl v Ernst Home Ctr, Inc*, 948 P2d 356, 365-366 (Utah App, 1997); *T... v T...*, 216 Va 867, 873 (1976); *Hoover v Moran*, 222 W Va 112, 119 (2008); *Klinke v Famous Recipe Fried Chicken, Inc*, 94 Wash 2d 255, 259-260 (1980); *McLellan v Charly*, 313 Wis 2d 623, 653 (2008); *B & W Glass, Inc v Weather Shield Mfg, Inc*, 829 P2d 809, 816-817 (Wy, 1992).

[5] "Stare decisis," the Latin phrase that means "to stand by the decided matters," is, of course, our shorthand for the principle that guides our branch of government: that we should respect our earlier decisions.

"whether changes in the law or facts no longer justify the questioned decision." *Robinson v Detroit*, 462 Mich 439, 464 (2000) (cleaned up).

As the brief tour of the statute's history, our relevant jurisprudence and that of our sister states demonstrates, *Opdyke* was correctly decided. Confronted with this same problem over the years and across jurisdictions, courts have repeatedly permitted parties to rely on promissory estoppel to enforce noncontractual promises in the right circumstances. This is unsurprising, as the doctrine exemplifies practical workability by setting out a straightforward legal rule for courts to follow. The Court of Appeals opinion in this case proves the point: for all its grousing about the result, the panel had no trouble reaching it.[6]

To overrule *Opdyke* and reject equitable exceptions to the statute of frauds would contravene core principles of stare decisis. Stability in the law is usually preferred, as it prevents arbitrary discretion by courts. *McCormick v Carrier*, 487 Mich 180, 210 (2010). Considerations in favor of stability are strongest in "cases involving property and contract rights, where reliance interests are involved . . . ." *Payne v Tennessee*, 501 US 808, 828 (1991). And overruling a 35-year-old unanimous opinion would be especially noteworthy. See Garner et al, *The Law of Judicial Precedent* (St Paul: Thomson/West, 2016), p 182 ("When everyone sitting on a case agrees on the outcome of an issue or case, the panel speaks with one voice. The decision carries the full weight of the panel's authority. . . . Other things being equal, courts will usually consider a precedent that speaks for a unanimous court as more authoritative than one that speaks for a split panel.").

But there's more. To abandon all equitable exceptions to the statute of frauds, as the dissent advocates, implicates not only *Opdyke*, but also more than a century of our Court's precedent (not to mention centuries of English common law before that). While the dissent believes that this result is warranted by the plain language of the text and by principles of judicial restraint, in fact overruling, in one fell swoop, centuries of well-settled precedent tilts in the other direction. "[T]he longer a rule has continued, the more thoroughly has it inevitably become interwoven with the business and property interests of the community at large; and, therefore, the more disastrous must be a change,

---

[6] Writing in support of the defendants, Michigan Realtors argues that *Opdyke* undermines good business practices, and the dissent is persuaded that this should feature in our consideration. We are in no position to gainsay these policy arguments, but they are more properly directed towards the Capitol Building, not the Hall of Justice. The Legislature has amended the Statute of Frauds to clarify the application of promissory estoppel for certain industries. See *Crown Technology Park v D&N Bank*, 242 Mich App 538, 549 (2000) (interpreting MCL 566.132(2)). It can do so for this industry if it chooses to.

especially a sudden change." Wells, A Treatise on the Doctrines of Res Judicata and Stare Decisis (1878), pp 544-545. The dissent has this characterization backwards; the majority's decision today is compelled by principles of stability and judicial modesty.[7]

The rule has not, moreover, declared open season on contracts. As an equitable doctrine, courts retain the discretion to strictly enforce the statute of frauds. Countless decisions have done just that. E.g. *Hazime v Martin Oil Co of Ind*, 792 F Supp 1067 (ED Mich, 1992); *Marrero v McDonnell Douglas Capital Corp*, 200 Mich App 438, 441-443 (1993); *Lovely v Dierkes*, 132 Mich App 485, 489-490 (1984). We have also limited the doctrine—such as requiring the promise to be "clear and definite"—to ensure it is not abused. *State Bank of Standish v Curry*, 442 Mich 76, 85 (1993). Contrary to the claims of the dissent, the reliance interests cut squarely in favor of maintaining our precedents. Citizens, businesses, and lawyers naturally will rely on any doctrine that has endured a century or more, particularly after it was clarified by *Opdyke*.[8] And that is especially true where the Legislature has never amended the statute of frauds to eliminate the exception.

While it may be correct that very few people have ever entered an agreement with the expectation of having it violated and later judicially enforced by promissory estoppel,

---

[7] If it is a retreat from textualism, as the dissent asserts, to recognize that in certain instances—this case being an obvious example—the doctrine of stare decisis operates as a pragmatic exception to dogmatic textualism, at least I have the comfort of knowing that I am in good company. See Scalia, *A Matter of Interpretation: Federal Courts and the Law*, pp 138-139 (Princeton: Princeton University Press, 1997) ("Originalism, like any other theory of interpretation put into practice in an ongoing system of law, must accommodate the doctrine of *stare decisis*; it cannot remake the world anew. It is of no more consequence at this point whether the Alien and Sedition Acts of 1798 were in accord with the original understanding of the First Amendment than it is whether *Marbury v. Madison* was decided correctly."); Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), pp 413-414 (asserting that "[s]tare decisis . . . is not a part of textualism. It is an exception to textualism . . . born not of logic but of necessity. Courts cannot consider anew every previously decided question that comes before them. Stare decisis has been a part of our law from time immemorial, and we must bow to it. All we categorically propose here is that, when a governing precedent deserving of stare decisis effect does not dictate a contrary disposition, judges ought to use proper methods of textual interpretation. If they will do that, then over time the law will be more certain, and the rule of law more secure.").

[8] Promissory estoppel has also gained widespread acceptance in learned treatises. E.g., Restatement Contracts, 2d, § 90; 4 Williston, Contracts (4th ed), § 8:4; 4 Am Jur 2d, Proof of Facts, § 641; 3 Williston & Jaeger, A Treatise on the Law of Contracts (3d ed), § 533A.

this view misses the point. Very few people have ever driven a car with the expectation of triggering their airbags, but the presence of the safety device allows them peace of mind and mitigates injuries from the unexpected crash. Just so, promissory estoppel allows parties to trust each other in matters where trust is essential and permits limited recovery where a party has acted in bad faith. See *Curry*, 442 Mich at 83-84. And, finally, the dissent makes no claim that any changes in the law justify overturning *Opdyke*. But this is not surprising because there have been no relevant changes to the law since *Opdyke* was decided, which underscores the ongoing vitality of the decision.

There are times when courts must overturn precedent. But, in my view, those occasions should be rare and the case for doing so compelling. This is plainly not one of those cases.

Even if doctrine had grown stale, this case would be a poor vehicle to upend it. I largely agree with the dissent's view of the facts, but one key point is missing: the defendant chose not to produce any evidence to support its position regarding summary disposition. Instead of giving the trial court facts from which it could have determined that the plaintiff's claim of promissory estoppel was not supported, it decided instead to ask the court to hold the doctrine inapplicable, an impossible request of any court but this one.

This strategic decision should have prevented the trial court from granting the defendant's motion for summary disposition under MCR 2.116(C)(8). In ruling on the motion, the trial court must accept all well-pled factual allegations as true in the light most favorable to the nonmoving party, and it may only grant the motion if the claims are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery. *Maiden v Rozwood*, 461 Mich 109, 119 (1999). At this stage, the court may only consider the pleadings. *Id*. at 119-120. The "existence and scope of the promise are questions of fact . . . ." *Curry*, 442 Mich at 84. The question for the trial court was, "Was there sufficient evidence, which, if believed by the trier of fact, would support a finding of estoppel sufficient to circumvent the statute of frauds?" *Conel Dev, Inc v River Rouge Savings Bank*, 84 Mich App 415, 423 (1978).

The plaintiffs claim that the defendant promised them they would be paid a broker's commission for their role in matching the defendant with a buyer. They submitted a photo of the defendant's sign that read "Brokers Protected" and alleged that this text is understood in their industry as a promise to pay a brokerage fee. The defendant made no counter allegations and submitted nothing to rebut the plaintiffs' claims. Perhaps if the defendant had submitted evidence in support of summary disposition, the trial could have properly concluded that there was no "clear and definite" promise, and thus, promissory estoppel was inapposite. But because it did not, the trial court was obligated to follow *Opdyke* and was not in a position to make the new rule of law the dissent would want this Court to make. And the Court of Appeals was correct to

reverse the trial court's grant of the defendant's motion on this record.

What's more, the procedural history of this case makes it a poor candidate to announce a watershed ruling. It is interlocutory, and discovery has not taken place, so there is still room for factual development. If we were to make the robust doctrinal move the dissent would have us make, this would be a startling case in which to do so.

For all these reasons, the Court is correct to deny leave on this case.

VIVIANO, J., joins the statement of MCCORMACK, J.

ZAHRA, J. (*dissenting*).

The issue in this case is straightforward. MCL 566.132(1)(e) plainly provides that an agreement, promise, or contract to pay a commission for or upon the sale of an interest in real estate promise is void unless that agreement, contract, or promise is in writing and signed by the party to be charged with the agreement, contract, or promise. Despite this legislative directive, this Court has sanctioned the enforcement of an unwritten promise to pay a commission for or upon the sale of an interest in real estate. Because the law clearly provides that this promise is void, it is not enforceable. Accordingly, I dissent. I would overrule this Court's decision in *Opdyke Investment Co v Norris Grain Co*[9] and apply the plain language of MCL 566.132(1)(e).

## I. BASIC FACTS AND PROCEDURAL HISTORY

Plaintiffs are real estate brokers who seek compensation for their efforts in procuring the sale of real property from defendant Howell Public Schools to defendant St. John Hospital. According to plaintiffs' complaint, Howell Public Schools offered for sale real property through a sign stating that the sale was "broker protected." The complaint alleges that this sign "explicitly promised [p]laintiffs that [Howell Public Schools] would honor the earned broker fee for delivering to [Howell Public Schools] a buyer." Plaintiffs allege that they relied on this promise by expending considerable effort to broker a sale of the property to St. John. According to the complaint, plaintiffs contacted an associate superintendent of Howell Public Schools and informed him they had a "client" interested in viewing their listed properties. Later, plaintiffs met with this associate superintendent at one of Howell Public Schools' properties, the Latson School Property, and toured the site. Afterwards, plaintiffs sent St. John a "Letter of Intent" to sign and return. St. John did not return the document. Plaintiffs also sent the associate superintendent a "Confidentiality, Commission & Broker Protection Agreement." This document was likewise not returned, apparently and according to plaintiffs' complaint, because

---

[9] *Opdyke Investment Co v Norris Grain Co*, 413 Mich 354 (1982).

plaintiffs sought an 8% commission for the sale. Plaintiffs allege in their complaint that "[u]pon information and belief, sometime in, or around, early April 2014, one of the Defendants caused Thomas A. Duke Company, a commercial real estate company, to fashion a purchase agreement for the sale of the Latson School Property from Howell [Public] Schools to St. John." Plaintiffs' complaint further alleges that defendants learned in late April 2014 of plaintiffs' efforts to broker a sale between them. Plaintiffs allege that "a few months later, on July 7, 2014, Howell [Public] Schools entered into a purchase agreement with St. John for the Latson School Property."

In lieu of an answer, defendants filed a motion for summary disposition, arguing that plaintiffs' complaint must be dismissed under MCL 566.132, commonly known as the statute of frauds. The statute of frauds requires certain types of agreements to be in writing and signed by the party against whom it will be enforced. This expressly includes "[a]n agreement, promise, or contract to pay a commission for or upon the sale of an interest in real estate." MCL 566.132(1)(e). Plaintiffs countered that the statute of frauds did not apply because plaintiffs pleaded a theory of promissory estoppel, which is a judicially created exception to the statute of frauds. The circuit court granted defendants' motion and dismissed the case.[10]

The Court of Appeals reversed, reluctantly holding that "[r]egardless of the wisdom of using a judicially created exception to a statute, we must apply it."[11] Relying entirely on this Court's decision in *Opdyke*, the panel stated that "[t]he Michigan Supreme Court created and has upheld the [promissory estoppel] exception" and acknowledged that it "is bound to follow decisions of our Supreme Court."[12] The panel urged this Court to grant leave to address the issue presented in this case, opining that "[t]he judicially created doctrine of promissory estoppel, as applied to the facts of this case, subsumes the statute of frauds and makes the statute of frauds irrelevant."[13]

Howell Public Schools appealed in this Court. We ordered argument on the application and requested that the parties file supplemental briefs on the question whether promissory estoppel is an exception to the statute of frauds.

---

[10] Plaintiffs and St. John reached a settlement and St. John was dismissed from the case.

[11] *North American Brokers v Howell Pub Sch*, unpublished per curiam opinion of the Court of Appeals, issued February 9, 2017 (Docket No 330126), p 3. Indeed, the panel "acknowledge[d] that [its] opinion reaches the *correct* result under our present legal framework," yet stated, "it is the *wrong* result." *Id*. at 3 n 2.

[12] *North American Brokers*, unpub op at 3 (quotation marks and citation omitted).

[13] *Id*. at 3 n 2.

## II. ANALYSIS

MCL 566.132(1) expressly provides in relevant part:

> In the following cases an agreement, contract, or promise is void unless that agreement, contract, or promise, or a note or memorandum of the agreement, contract, or promise is in writing and signed with an authorized signature by the party to be charged with the agreement, contract, or promise:
>
> \* \* \*
>
> (e) An agreement, promise, or contract to pay a commission for or upon the sale of an interest in real estate.

There is no dispute that the plain language of MCL 566.132 renders "void" Howell Public Schools' alleged "promise . . . to pay a commission for or upon the sale of an interest in land" because there is no "writing" that is "signed with an authorized signature by" Howell Public Schools. In fact, plaintiffs admit that Howell Public Schools flat-out refused to sign their proposed agreement. The text of MCL 566.132 is clear and definite; unless there is a writing signed with an authorized signature by the party to be charged, the promise is void. The Legislature did not provide for any exceptions to this rule. Thus, the statute of frauds should apply in this case.

Like the Court of Appeals panel in this case, I have previously been in a position to "reluctantly agree" that the statute of frauds can be circumvented through judicially created exceptions "[r]ather than deferring to the Legislature to address through the legislative amendment process any perceived inequity in the statute of frauds . . . ."[14] In doing so, "Michigan courts have by judicial fiat created gaping holes in the statute of frauds that are inconsistent with the express language of the statute and the policy supporting it[.]"[15] Now, as a Justice of the Michigan Supreme Court, I continue to repudiate any judicially created doctrine that has "developed to avoid the arbitrary and unjust results required by an overly mechanistic application of the [statute of frauds]."[16] It bears repeating that

---

[14] *Kelly-Stehney & Assoc, Inc v MacDonald's Indus Prod, Inc*, 254 Mich App 608, 613-615 (2003), vacated on other grounds 469 Mich 1046 (2004).

[15] *Id*. at 615.

[16] *Opdyke*, 413 Mich at 365.

[a]llowing judge-made doctrines such as estoppel to override and preclude the application of legislatively created laws such as the statute of frauds "is contrary to well-founded principles of statutory construction and is inconsistent with traditional notions of the separation of powers between the judicial and legislative branches of government."[17]

The concurrence states that we ought not reverse *Opdyke* under principles of stare decisis. Indeed, this Court is generally reluctant to overturn precedent. It is often argued that the Court should be particularly careful overturning statutory precedent that the Legislature is in a position to clarify on its own through new legislation. Nonetheless, this Court has recognized that "legislative acquiescence . . . is an exceptionally poor indicator of legislative intent."[18] Further, this Court has also made clear that egregious departures from the plain language of the text ought to be addressed sooner than later, explaining:

[I]t is to the words of the statute itself that a citizen first looks for guidance in directing his actions. This is the essence of the rule of law: to know in advance what the rules of society are. Thus, if the words of the statute are clear, the actor should be able to expect . . . that they will be carried out by all in society, including the courts. In fact, should a court confound those legitimate citizen expectations by misreading or misconstruing a statute, it is that court itself that has disrupted the reliance interest. When that happens, a subsequent court, rather than holding to the distorted reading because of the doctrine of stare decisis, should overrule the earlier court's misconstruction. The reason for this is that the court in distorting the statute was engaged in a form of judicial usurpation that runs counter to the bedrock principle of American constitutionalism, i.e., that the lawmaking power is reposed in the people as reflected in the work of the Legislature, and, absent a constitutional violation, the courts have no legitimacy in overruling or nullifying the people's representatives. Moreover, not only does such a compromising by a court of the citizen's ability to rely on a statute have no constitutional warrant, it can gain no higher pedigree as later courts repeat the error. [*Robinson v Detroit*, 462 Mich 439, 467-468 (2000).]

In such cases, where the result of a decision effectively "usurp[s]" or "nullif[ies]" the "legislative function," this Court is obligated to correct that decision, regardless

---

[17] *Kelly-Stehney*, 254 Mich App at 615-616, quoting *Crown Technology Park v D & N Bank, FSB*, 242 Mich App 538, 548 n 4, (2000), citing Scalia, *A Matter of Interpretation: Federal Courts and the Law* (New Jersey: Princeton University Press, 1997), pp 14-29.

[18] *McCahan v Brennan,* 492 Mich 730, 749 (2012).

whether the Legislature has " 'acquiesced' in the decisions of the Court to which it has not responded . . . ."[19]  In my view, *Opdyke*, which was apparently "developed to avoid the arbitrary and unjust results required by an overly mechanistic application of the [statute of frauds],"[20] is an ideal candidate for reversal.  This Court in *Opdyke* not only usurped the Legislature's power but simultaneously amended the statute of frauds by judicial fiat to frustrate the express intentions of the Legislature,[21] i.e., to render void certain agreements, contracts, or promises unless in writing and signed.

In determining whether to overrule a prior case, this Court first considers whether the earlier case was wrongly decided.[22]  *Opdyke* disregarded the language of MCL 566.132 and deviated from this Court's pattern of cases interpreting it.[23]  The Court stated that "[s]ince the statute of frauds only applies to certain 'contracts', recovery based on a noncontractual promise falls outside the scope of the statute of frauds."[24]  Yet MCL 566.132(1)(e) expressly applies not just to contracts but also, explicitly, to "promise[s]."[25]  And assuming the goal of the statute of frauds is to protect against fraud and perjury for transactions that the Legislature deemed so significant as to require that the transaction be memorialized in writing, the doctrine of promissory estoppel adds nothing to advance this purpose.  As demonstrated in this case, Howell Public Schools has done nothing legally, or even morally, wrong, yet it is now subject to potential liability because plaintiffs have claimed that they relied on a promise.  And Howell Public Schools was not even aware of plaintiffs' reliance.  Further, even though Howell Public Schools expressly refused to execute a contract with plaintiffs, this Court has essentially imposed the obligation of that contract upon Howell Public Schools.

As cogently explained by amicus curiae Michigan Realtors (amicus), *Opdyke* undermines the good business practices of more than 28,000 appraisers, brokers, and

---

[19] Collier & DeRosier, *Understanding The Overrulings: A Response To Robert Sedler*, 56 Wayne L Rev 1761, 1777-1778 (2010).

[20] *Opdyke*, 413 Mich at 365.

[21] *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 213 (2007).

[22] *Robinson*, 462 Mich 439, 463-468.

[23] MCL 566.132 has been amended and renumbered since *Opdyke* was decided, but the changes have no bearing on this analysis.  See 1974 PA 343 and 1992 PA 245.

[24] *Opdyke*, 413 Mich at 370.

[25] The version of the provision in effect when *Opdyke* was decided, MCL 566.132(e), also applied to a "promise."  See 1974 PA 343.

salespersons licensed under Michigan law, who are "consistently taught that there is no entitlement to a commission based upon agreements or promises that are not in writing and are not signed by the party to be charged." The members of amicus are clearly significant stakeholders to this aspect of Michigan law, as they are involved in hundreds of real estate transactions each day. This Court should not dismiss amicus's concern that "[t]he application of promissory estoppel to circumvent the statute of frauds creates an exception to an otherwise clear rule and fosters uncertainty and ambiguity in what are currently fairly 'cut and dried' transactions." In particular, amicus highlights that "[t]he application of promissory estoppel to the . . . statute of frauds potentially subjects sellers of residential real estate in Michigan to claims for more than one commission." Members of amicus are not seeking special treatment, but are only requesting that Michigan courts faithfully apply the plain language of the statute of frauds in all cases. Sustaining this Court's decision in *Opdyke* will only continue to undermine the "practical workability" of amicus's good business practices and result in unnecessary and costly litigation.[26] Thus, I am convinced that *Opdyke* was wrongly decided.

The notion that promissory estoppel is barred by a legislative directive that particular contracts must be in writing is not radical. Indeed, several out-of-state jurisdictions have enforced the statute of frauds and rejected judicially created exceptions to it for the same reason. *Stearns v Emery-Waterhouse Co*[27] (stating that the application of promissory estoppel "contravenes the policy of the Statute to prevent fraud"); *Greaves v Med Imaging Sys, Inc*[28] ("We have consistently declined to adopt [the application of promissory estoppel to avoid the statute of frauds], although we have considered it in several prior cases."); *Morsinkhoff v DeLuxe Laundry & Dry Cleaning Co*[29] ("To allow recovery on the theory of promissory estoppel would abrogate the purpose and intent of

---

[26] I strongly disagree with the concurrence that amicus has presented policy arguments that "are more properly directed towards the Capitol Building, not the Hall of Justice." The only policy that Howell Public Schools and amicus seek is to apply is that which the Legislature has already written in the statute of frauds. The problem is not that the Legislature has failed to act; it is that this Court refuses to apply the law by giving plain and ordinary meaning to the legislative mandate that "[a]n agreement, promise, or contract to pay a commission for or upon the sale of an interest in real estate" "must be in writing." MCL 566.132(1)(e). And to suggest that these arguments are better directed towards the same body that wrote this clear and unambiguous directive is truly puzzling, given this Court's refusal to apply the statute of frauds as currently written.

[27] *Stearns v Emery-Waterhouse Co*, 596 A2d 72, 74-75 (Me, 1991).

[28] *Greaves v Med Imaging Sys, Inc*, 124 Wash 2d 389 (1994).

[29] *Morsinkhoff v DeLuxe Laundry & Dry Cleaning Co*, 344 SW2d 639, 644 (Mo App, 1961).

the legislature in enacting the Statute of Frauds and would nullify its fundamental requirements."); *Tiffany Inc v WMK Transit Mix, Inc*[30] (Allowing a claim for promissory estoppel would mean "the Statute of Frauds would no longer have any effect."); *Sinclair v Sullivan Chevrolet Co*[31] ("Where, however, a case is clearly within the Statute of Frauds, promissory estoppel is inapplicable, for the net effect would be to repeal the Statute completely."); *Austin v Cash*[32] (" '[W]here a case is clearly within the statute of frauds, promissory estoppel is inapplicable, for the net effect would be to repeal the statute completely. . . . [T]he moral wrong of refusing to be bound by an agreement because it does not comply with the statute of frauds, does not of itself authorize the application of the doctrine of estoppel, because the breach of a promise which the law does not regard as binding is not a fraud.' "); *Anderson Const Co, Inc v Lyon Metal Prod, Inc*[33] ("[T]his Court, contrary to the course pursued by some others, has uniformly held that it is without power to engraft exceptions on the statute, and must enforce it as written. . . . To hold otherwise would destroy the purpose of the statute to prevent frauds and perjuries."); *Bethune v City of Mountain Brook*[34] ("[I]t is well settled in Alabama that an executory agreement which is void under the statute of frauds cannot be made effectual by estoppel merely because it has been acted on by the promisee, and has not been performed by the promisor."); see also *Lovely v Dierkes*[35] ("It would seem inconsistent to claim detrimental reliance on an oral contract while acknowledging the importance of a written contract.")

Likewise, our caselaw supports the conclusion that the statute of frauds cannot be circumvented by a promissory estoppel claim. See, e.g., *Collin v Kittelberger*[36] (applying prospectively from effective date of the statute of frauds, any contract for commissions on order of realty must be in writing, but did not affect a contract existing when it took effect); *Paul v Graham*[37] (holding that "[i]n order to give the act the effect which the

---

[30] *Tiffany Inc v WMK Transit Mix, Inc*, 16 Ariz App 415, 421 (1972).

[31] *Sinclair v Sullivan Chevrolet Co*, 45 Ill App 2d 10, 17 (1964).

[32] *Austin v Cash*, 274 Mont 54, 62 (1995), quoting *Schwedes v Romain*, 179 Mont 466, 472 (1978).

[33] *Anderson Const Co, Inc v Lyon Metal Prod, Inc*, 370 So 2d 935, 937 (Miss, 1979) (quotation marks and citation omitted).

[34] *Bethune v City of Mountain Brook*, 293 Ala 89, 93 (1974).

[35] *Lovely v Dierkes*, 132 Mich App 485, 492 n 1 (1984) (PETERSON, J., dissenting).

[36] *Collin v Kittelberger*, 193 Mich 133 (1916).

[37] *Paul v Graham*, 193 Mich 447, 451 (1916).

Legislature evidently intended it should have, . . . no recovery can be had under this section [of the statute of frauds] unless the agreement therefor is in writing; *McGavock v Ducharme*[38] (holding that the statute of frauds rendered absolutely void an oral promise to pay 3% commission on the sale of a property); *Slocum v Smith*[39] (holding that the provision of the statute of frauds related to promises to pay commissions extended to agreements to purchase as well as agreements to sell, and determining that plaintiff was not entitled to recovery under a quantum meruit claim based on an oral promise in violation of the statute of frauds); *Smith v Starke*[40] (holding that oral agreement to find a purchaser for a farm in exchange for commission was void under the statute of frauds, and plaintiff was not permitted recovery under quantum meruit); *Aetna Mtg Co v Dembs*[41] (holding that the statute of frauds required that an agreement for commission for obtaining mortgage on land be reduced to a signed writing and an oral agreement for commission was not valid). Historically, this Court has consistently construed this particular provision of the statute of frauds to prevent oral promises and claims for equitable remedies from circumventing the statute's writing requirement. Accordingly, the natural conclusion is that *Opdyke* is an aberration.[42]

---

[38] *McGavock v Ducharme*, 192 Mich 98 (1916).

[39] *Slocum v Smith*, 195 Mich 281 (1917).

[40] *Smith v Starke*, 196 Mich 311 (1917).

[41] *Aetna Mtg Co v Dembs*, 13 Mich App 686 (1968).

[42] It is passing strange that the concurrence would quote Justice Antonin Scalia to place the question whether *Opdyke* should be overruled on equal footing with the questions "whether the Alien and Sedition Acts of 1798 were in accord with the original understanding of the First Amendment . . . [and] whether *Marbury v. Madison* was decided correctly." As Justice Scalia noted in his more recent book with Bryan Garner, *Reading Law: The Interpretation of Legal Texts*:

> We do not propose that all the decisions made, and doctrines adopted, in the past half-century or so of unrestrained constitutional improvisation be set aside—only those that fail to meet the criteria for stare decisis. These include consideration of (1) whether harm will be caused to those who justifiably relied on the decision, (2) how clear it is that the decision was textually and historically wrong, (3) whether the decision has been generally accepted by society, and (4) whether the decision permanently places courts in the position of making policy calls appropriate for elected officials. [Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 412 (citations omitted)].

To determine whether a case that was wrongly decided should be overruled, the Court must "examine reliance interests," specifically:

> whether the prior decision defies "practical workability"; whether the prior decision has become so embedded, so fundamental to everyone's expectations that to change it would produce not just readjustments, but practical real-world dislocations; whether changes in the law or facts no longer justify the prior decision; and whether the prior decision misread or misconstrued a statute.[43]

Suffice to say that very few people have ever sought to enter an agreement, contract, or promise expecting to enforce the agreement, contract, or promise based on an equitable exception to the statute of frauds. And for those who have done so, they would necessarily be precluded from asserting an equitable claim because they would in effect have "unclean hands." Thus, overruling *Opdyke* would not unsettle a single person's legitimate expectations.[44]

---

*Opdyke* is not only inconsistent with Michigan caselaw that suggests the statute of frauds cannot be circumvented by a promissory estoppel, see notes 28 through 32 of this statement, it has on at least three occasions been criticized in the Court of Appeals. See, e.g., *Lovely*, 132 Mich App at 491-496 (PETERSON, J., dissenting); *Kelly-Stehney & Assoc, Inc*, 254 Mich App at 613-615; and *North American Brokers*, unpub op at 3, the opinion of the Court of Appeals in the instant case. Thus *Opdyke* hardly qualifies, in the vein of *Marbury v Madison*, 5 US (1 Cranch) 137 (1803), as "generally accepted by society." Moreover, *Opdyke* is textually wrong, and permanently leaves this Court and lower courts in the position of determining on a case-by-case basis which of the many competing policy interests presented deserves exception from application of the plain language of the statute of frauds.

The concurrence caricatures the dissenting position as "dogmatic textualism." To the contrary, the dissent merely recognizes that it is the text of the law to which the people first look to understand their rights and responsibilities. And the "doctrine [of stare decisis] is not, to be sure, an imprisonment of reason." *United States v Int'l Boxing Club of NY*, 348 US 236, 249 (1955) (Frankfurter, J., dissenting).

[43] *Rowland*, 477 Mich at 215, citing *Robinson*, 462 Mich at 464-467.

[44] The fact that a party may eventually rely on promissory estoppel or another equitable exception after they make an oral agreement and once litigation has ensued is irrelevant to the stare decisis analysis. In analyzing reliance interests and whether the prior decision has become so embedded or fundamental to everyone's expectations that to change it would produce significant dislocations, this Court does not look to after-the-fact awareness of the previous caselaw. See *Robinson*, 462 Mich at 466-467 ("Such after-the-

The concurrence also suggests that *Opdyke*, a case decided by this Court in 1982, ought not be reversed because it is grounded in common law principles of equities that are centuries old. While I agree that "[t]he equitable principle of estoppel is many centuries old," the principle of promissory estoppel was not developed until sometime in the twentieth century, was not embraced by the Michigan Supreme Court until 1977,[45] and was not accepted as an exception to the statute of frauds until *Opdyke* in 1982. *Black's Law Dictionary* (10th ed) reflects that the earliest known use of the phrase "promissory estoppel" in English was in 1924, and scholars recognize that there was "initial judicial reluctance to apply the doctrine after its formulation in section 90 of the first *Restatement of Contracts . . .* in 1932."[46] Unlike estoppel in general, the doctrine of promissory estoppel stands out, as once suggested, in "that promissory estoppel had become 'perhaps the most radical and expansive development of this century in the law of promissory liability.' "[47] Born of the legal realism movement, which espoused "[t]he theory that law is based not on formal rules or principles but instead on judicial decisions deriving from social interests and public policy as conceived by individual judges,"[48] the doctrine of promissory estoppel is plainly in tension with the more recent emphasis from this Court on the doctrine of textualism, in which "the words of a governing text are of paramount concern and . . . what they fairly convey in their context is what the text means"[49] "Courts that have taken a textualist approach with respect to implied terms generally have not identified implied estoppel exceptions."[50] Rather, a textualist approach recognizes that where the Legislature has intended for exceptions to apply to the statute of frauds, it has expressly provided those exceptions.

Accordingly, a textualist approach would embrace the notion that when the Legislature intended for common law and other exceptions to apply to the statute of

---

fact awareness does not rise to the level of a reliance interest because to have reliance the knowledge must be of the sort that causes a person or entity to attempt to conform his conduct to a certain norm before the triggering event.").

[45] *Huhtala v Travelers Ins Co*, 401 Mich 118, 126-130 (1977).

[46] Feinman, *Promissory Estoppel and Judicial Method*, 97 Harv L Rev 678, 678 (1984).

[47] Knapp, *Rescuing Reliance: The Perils Of Promissory Estoppel*, 49 Hastings L J 1191, 1192 (1998) (citation omitted).

[48] *Black's Law Dictionary* (10th ed).

[49] *Id*.

[50] Maggs, *Estoppel And Textualism*, 54 Am J Comp L 167, 178 (2006).

frauds for the uniform commercial code, it expressly provided those exceptions. See MCL 440.2201(3)(a) through (c). This is reflected in Justice MARKMAN's concurrence in *Vittiglio v Vittiglio*.[51] Although Justice MCCORMACK posits that in *Vittiglio* "the Chief Justice has recognized another equitable doctrine, partial performance, as creating an exception to the statute of frauds," there is a textual basis for applying part performance to remove an agreement from within the statute of frauds. MCL 566.106 and MCL 566.108 were the statute of frauds provisions at issue in *Vittiglio*, and those provisions are distinct from the statute of frauds provision at issue in the instant case, i.e., MCL 566.132(1)(e). MCL 566.106 provides as follows:

> No estate or interest in lands, other than leases for a term not exceeding 1 year, nor any trust or power over or concerning lands, or in any manner relating thereto, shall hereafter be created, granted, assigned, surrendered or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by some person thereunto by him lawfully authorized by writing.

And MCL 566.108 provides as follows:

> Every contract for the leasing for a longer period than 1 year, or for the sale of any lands, or any interest in lands, shall be void, unless the contract, or some note or memorandum thereof be in writing, and signed by the party by whom the lease or sale is to be made, or by some person thereunto by him lawfully authorized in writing: Provided, That whenever any lands or interest in lands shall be sold at public auction and the auctioneer or the clerk of the auction at the time of the sale enters in a sale book a memorandum specifying the description and price of the land sold and the name of the purchaser, such memorandum, together with the auction bills, catalog or written or printed notice of sale containing the name of the person on whose account the sale is made and the terms of sale, shall be deemed a memorandum of the contract of sale within the meaning of this section.

---

[51] *Vittiglio v Vittiglio*, 493 Mich 936 (2013) (MARKMAN, J., concurring).

Although MCL 566.106 and MCL 566.108 are distinct statute of frauds provisions from MCL 566.132, all three provisions are contained within Chapter 566 of the Michigan Compiled Laws. And MCL 566.110 provides as follows: "Nothing in this chapter [i.e., Chapter 566] contained shall be construed to abridge the powers of the court of chancery to compel the specific performance of agreements, in cases of *part performance* of such agreements." That is, the Legislature has explicitly adopted a provision to make clear that "part performance" may operate as an exception to the statute of frauds.

That the Legislature felt the need to affirmatively specify that "part performance" may constitute an exception to the statute of frauds reinforces the proposition that, as actually written, the statute of frauds does not already contain equitable exceptions of the sort read into it by the majority in acquiescing to *Opdyke*. Clearly, where the Legislature believes it proper to establish an exception to the statute of frauds, it has provided for such exception. When the history of this Court's retreat from textually grounded interpretations of the law is written, its erosion of the statute of frauds in such cases as this will be writ large.

## III. CONCLUSION

I would overrule this Court's decision in *Opdyke* and apply the plain language of MCL 566.132(1). Accordingly, I would reverse the opinion and order of the Court of Appeals and remand to the circuit court to reinstate the judgment in favor of Howell Public Schools.

MARKMAN, C.J., and WILDER, J., join the statement of ZAHRA, J.



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

June 29, 2018



d0626

Clerk